752 So.2d 957 (1999)
Elizabeth CORTEZ and Murphy Cortez, Jr.
v.
ZURICH INSURANCE CO., R & M Foods, Inc., Noel Poirier, et al.
No. 98 CA 2059.
Court of Appeal of Louisiana, First Circuit.
December 28, 1999.
Rehearing Denied March 22, 2000.
*958 Michael Hingle, Ronald J. Favre, Michael A. Sevante, Hammond, Counsel for Plaintiff/Appellee Elizabeth Cortez.
Charles A. Boggs, Anne E. Medo, New Orleans, Counsel for Defendant/Appellant Genlyte Group, Inc.
Alton B. Lewis, Hammond, Counsel for Defendants/Appellants Zurich Insurance Co., R & M Foods, Inc., and Super Valu Stores, Inc.
BEFORE: SHORTESS, PARRO, AND KUHN, JJ.
KUHN, Judge.
This appeal involves a personal injury suit in which plaintiff, Elizabeth Cortez,[1] filed suit seeking to recover damages for injuries allegedly sustained when a light pole fell on the roof of her car. The defendants involved in this appeal are: Genlyte Group Incorporated ("Genlyte"), formerly d/b/a Wide-Lite International Corporation ("Wide-Lite"), the manufacturer of the light pole; R & M Foods, Inc. ("R & M"), the owner/operator of a retail grocery store, which operated under the franchise name of Sunflower Foods, Inc. ("Sunflower");[2] and Zurich Insurance *959 Company ("Zurich"), the liability insurer of R & M. Channel Shopping Center Partnership ("Channel Shopping Center"),[3] Noel Poirier, and Gary Poirier, the owners/lessors of the shopping center premises, were initially named as defendants but were dismissed from the suit prior to trial.[4]
After a jury trial, a judgment was signed awarding damages in favor of plaintiff in accordance with the jury verdict, which allocated fault among Genlyte, R & M, and Channel Shopping Center. Based on its conclusion that a reallocation of fault was necessary, the trial court granted a judgment notwithstanding the verdict ("JNOV"). Cortez and Genlyte have appealed, and R & M and Zurich have answered the appeal. The issues raised are: whether the trial court erred in granting the JNOV; whether the trial court (or, alternatively, the jury) erred in assessing fault to R & M; and whether the jury's award of damages is supported by the record. We reverse the JNOV and reinstate the original judgment based on the jury verdict.

I. FACTS AND PROCEDURAL BACKGROUND
On the morning of March 1, 1991, Mrs. Cortez drove to the Sunflower store located within the Channel Shopping Center in Hammond, Louisiana. When she arrived at the shopping center, the weather conditions were windy and raining. A line of severe thunderstorms passed through the Hammond area that morning with winds estimated at sixty to seventy miles per hour. After she parked her car in the parking lot of the shopping center and while she was still sitting in the driver's seat of her car, she heard a popping noise and saw a light pole falling toward her car. It struck the roof of her car and punctured a hole in the top of the roof over the back passenger seat. Cortez testified that due to the impact of the pole, the roof of the car struck her on the top of her head. Cortez stated that she felt pain right after the impact.
Although Cortez was not sure whether it was safe to leave her car, she forced her door open and went into the Sunflower store. She testified that she was scared, terrified, and shaking. She called her husband, who arrived with other family members about a half-hour later to pick her up. Upon leaving the Sunflower store, she went directly to the emergency room, where she complained of head and neck injuries and received treatment.
The Channel Shopping Center light pole which fell on Cortez's car was a forty-foot tall pole that was designed and manufactured by Genlyte, who formerly did business as Wide-Lite. The construction of the pole consisted of three upright aluminum pipes (or members) in a tripod design, joined by welded castings at intervals along its length. The three upright pipes were threaded into a cast aluminum base. According to Wide-Lite specifications, this particular type of pole, which was designed for use with a Mercury "4000" fixture or four 1000-watt "Wide-Lite" mercury vapor floodlights, was capable of withstanding winds of up to 100 miles per hour in velocity. When the Channel Shopping Center was built in the mid-1960's, two of these poles were installed in the shopping center parking lot, with a Mercury "4000" light fixture at the top of each pole.
Some time prior to the accident, the owners of the shopping center replaced the original Mercury "4000" fixture on each pole with a different set of fixtures. During the early 1970's, R & M began operating the Sunflower store. According to the *960 testimony of Mr. Richard C. Martin, one of the owners of R & M, and Mr. Charles D. Shoemake, an electrical contractor employed by R & M, the original fixtures had been replaced prior to the time that R & M began operating the store. At that time, each pole had four light fixtures at the top. During May of 1990, Martin asked Shoemake to suggest methods to provide additional lighting for the parking lot. One of Shoemake's suggestions was implemented by Shoemake on R & M's behalf. It involved installing a bracket which held three additional light fixtures weighing a total of one hundred pounds about twenty to twenty-five feet above ground on the pole which ultimately fell on Cortez's car.
From the early 1970's when R & M began operating the Sunflower store, it instituted the practice of displaying several decorative banners/streamers of multicolored triangular pennants in a V-shaped fashion across the parking lot. R & M installed eighteen flags on poles evenly spaced across the top of the store front. One end of each banner was tied to one of the flagpoles on top of the store and the other end of the banner was tied to the light pole in the parking lot. The testimony of the store employees and store representatives varied regarding the number of banners which typically had been tied to the light pole, with the number varying from eight to eighteen. The banners were tied at a height of about fourteen to seventeen feet above the ground. The length of the banners varied from one hundred feet to one hundred thirty-two feet, depending on the distance from each flag to the pole. The banners had been tied only to the light pole in question, which fell on Cortez's car. The other light pole in the parking lot had not been used in this fashion.
During the trial, plaintiff offered testimony suggesting that several factors, including the defective construction and design of the pole, the installation of the additional lights on the pole, and the attachment of the banners to the pole by R & M, contributed to the light pole's failure. R & M offered testimony suggesting that the light pole was defective in design and manufacture, and that these defects were the sole cause of the failure of the pole. The testimony offered by Genlyte supported a conclusion that the pulling force of the banners combined with the force of the wind was the cause of the pole failure. The parties stipulated during trial that the light poles in the shopping center parking lot were under the care, custody and control of the shopping center owners, Channel Shopping Center, Noel Poirier, and Gary Poirier.
The jury found that: 1) Cortez was injured on March 1, 1991; 2) her injury was not caused by an act of God; and 3) R & M/Sunflower, Genlyte, and Channel Shopping Center were each at fault in causing Cortez's injury. In apportioning the percentages of fault, the jury assigned ten percent to R & M/Sunflower, twenty percent to Genlyte, and seventy percent to Channel Shopping Center. The jury assessed damages totaling $260,000.00.
Based on the jury verdict, the trial court signed a judgment, dated January 24, 1997, in favor of Cortez and against R & M, Sunflower, and Zurich in the amount of $26,000.00, and in favor of Cortez and against Genlyte in the amount of $52,000.00. Plaintiff responded by filing a motion for a new trial or in the alternative, a JNOV. On January 20, 1998, the trial court signed a JNOV which set aside the jury's allocation of fault and reallocated fault as follows: ten percent to R & M/Sunflower, ninety percent to Genlyte, and zero percent to Channel Shopping Center. Genlyte and Cortez appealed the January 24, 1997, and January 20, 1998 judgments. R & M and Zurich answered the appeal.
On appeal, Genlyte argues that the trial court erred in granting the JNOV and that the jury's verdict allocating fault should be reinstated. Alternatively, Genlyte urges that in granting the JNOV, the trial court erred by not reallocating a greater portion *961 of fault to R & M/Sunflower. Genlyte also contends that the damages awarded to plaintiff should be reduced because she did not prove that the incident caused extensive damages.
Although Cortez appealed from both judgments below, on appeal, she asks only that the January 20, 1998 judgment be affirmed. She submits the trial court did not err in granting the JNOV, and that the jury's award of damages was appropriate.
In its answer, R & M urges it has been aggrieved by the jury's and the trial court's action of assessing ten percent of the fault to R & M. It asserts no fault should have been assessed to R & M and prays that the judgment be modified accordingly.

II. ANALYSIS

A. Applicable Legal Principles

1. Strict Liability
Louisiana Civil Code article 2317 provides, in pertinent part, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by ... the things which we have in our custody."[5] Strict liability is liability without personal fault which is based upon the status as owner or custodian. Celestine v. Union Oil Co. of California, 94-1868, pp. 6-7 (La.4/10/95), 652 So.2d 1299, 1303. When harm results from the defect of a thing which creates an unreasonable risk of harm to others, a person legally responsible for the supervision, care, or guardianship of the thing may be held liable for the damage caused, despite the fact that no personal negligent act or inattention on the part of that person is proved. Simeon v. Doe, 618 So.2d 848, 851 (La.1993).
Under a strict liability theory, plaintiff has the burden of proving: (1) the property which caused the damage was in the custody of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises; and (3) the defect in the property was a cause-infact of the resulting injury. See Oster v. Dep't of Transp. & Dev., State of Louisiana, 582 So.2d 1285, 1288 (La.1991); Cazes v. Parish of West Baton Rouge, 97-2824, p.3 (La.App. 1st Cir.12/30/98), 744 So.2d 54. Once the injured person has met this burden, the owner or guardian responsible for the defective thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Simeon v. Doe, 618 So.2d at 851, Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 116 (La.1986); Loescher v. Parr, 324 So.2d 441 (La.1975).

2. Products Liability
The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of recovery against manufacturers for damage caused by their products. Louisiana Revised Statute 9:2800.54 reads:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition...;
(2) The product is unreasonably dangerous in design ...;

*962 (3) The product is unreasonably dangerous because an adequate warning about the product has not been provided...; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product ....
C. The characteristic of the product that renders it unreasonably dangerous... must exist at the time the product left the control of its manufacturer ... or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

3. Duty of a Merchant/Store Operator
In general, store owners owe a duty to patrons to take reasonable care for their safety, although they are not the insurer of the patron's safety. The extent of this duty, though limited, is an evolving responsibility dependent on the existence of a particular risk, the likelihood that it will be encountered by patrons, the feasibility and reasonableness of requiring storekeepers to guard against it, and certain policy considerations which might move a tribunal to find the storekeeper liable. But the courts have said proprietors of public places have a duty to protect patrons from injuries caused by third parties only when it is within their power to do so. Whether a risk is within the ambit of the duty generally owed by storekeepers requires the court to consider the particular facts and circumstances of the case. Parish v. L.M. Daigle Oil Co., Inc., 98-1716 (La.App. 3d Cir. 6/23/99), 742 So.2d 18, writ denied, 99-1417 (La.9/3/99), 747 So.2d 551.

4. Standards of Review

a. Manifest Error
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a factfinder's determinations, the appellate court must find from the record that: 1) a reasonable factual basis does not exist for the finding of the trial court, and 2) the record establishes that the finding is clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d at 844; Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.

b. Abuse of Discretion
The trier of fact is given much discretion in the assessment of damages. La.C.C. art. 2324.1 Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The abuse of discretion standard of review requires an inquiry as to whether the award for the particular injuries and their effects on the particular plaintiff under the particular circumstances is a clear abuse of the much discretion of the trier of fact. A comparison of other awards in other cases is appropriate *963 only after the appellate court finds such abuse of discretion. Then it is proper to resort to prior awards only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

B. Summary of Trial Testimony
Dr. Mehdy Sabbaghian, a mechanical engineer with expertise in stress failures and design, testified that the failure of the pole was due to the tension of the banners pulling on the pole. He explained that the banners attached to the pole created a force which pulled the pole toward the building. When this pulling force was combined with the high wind load on the banners and the pole, the pole was brought to its breaking point. Sabbaghian found that the upright member of the pole which was furthest from the store failed first as a result of the tension. At that point, the banners and wind load pulled the other two members, which broke at the base and fell toward the store. He concluded that the failure was more than likely not due to fatigue but rather due to tension.
Sabbaghian stated that when the wind blew in any direction, two of the four fixtures on the top of the pole were catching the thrust of the wind. With respect to the lights which were added by R & M approximately halfway up the pole, Sabbaghian stated that these lights were a very small factor in the pole falling. He found that these lights added about twenty percent more to the twisting stress. In terms of the wind or weight load, he found the fixtures halfway up the pole were not as significant as the fixtures on the very top. Overall, he considered the weight of the lights to be insignificant compared to the stress placed on the pole by the banners and the force of the wind on the banners and the pole.
As constructed with the threaded base, Sabbaghian found that the pole, without the banners attached to it, was able to sustain wind loads of at least 118 miles per hour, in excess of the 100 miles per hour design specifications of the pole. He testified that the upright member furthest from the store failed when it was pulled in tension due to the load of the banners and the wind. Afterwards, the other two upright members failed at the threads due to tension and bending. He explained that whether the upright members were welded or threaded was immaterial because the pipe that the banners were pulling against failed before the other legs of the pole failed at the thread.
Fred Vanderbrook, a mechanical engineer, investigated the light pole accident to determine the primary mode of failure. He examined pictures of the pole after it failed and reviewed the calculations of Sabbaghian. He testified that he believed the pole failed due to the stress of the wind forces acting on the banners of pennants which had been tied to the pole. He explained that the wind forces acting on the pennants caused substantial lateral or horizontal force on the pole, which caused it to collapse in the direction of the store. He explained that the pole failed because it was overstressed, the stress being greater than the strength of the pipe. He believed the primary cause of the overstress was the tensile forces exerted by the banners blowing in the wind. He estimated the wind forces to be less than seventy to seventy-five miles per hour and opined that the pole failure was not caused by an act of God.
Vanderbrook testified that it appeared that the pole broke off down inside the base. He stated that the base of the pole did not appear to have been constructed with the use of fillet welds. He explained that the use of fillet welds rather than threaded connections at the base may have increased the pole's strength.
Dr. Ewing Berkley Traughaber, a structural engineer, testified that the light pole failed due to fatigue resulting from the *964 pole being poorly designed with no diagonal bracing. He explained that the pole had too much torsional flexibility, which gave the pole the tendency to twist. Although the pole was designed with horizontal bracing, he explained that the three-sided pole needed diagonal bracing to provide torsional rigidity. Addressing the effect of the lights which had been added approximately halfway up the pole, Traughaber testified that if the lights were not contained within the three upright members of the pole but were attached so that they stuck out beyond the three up-right members of the pole, the additional lights could have had a great effect on the pole by making it more susceptible to twisting.
Traughaber addressed the threading of the pole at its base. He stated that the cross-sectional area of pipe is reduced when it is threaded and that if a pipe breaks, it usually breaks in the threads. Upon examining photographs of the pipes, he detected corrosion on the pipe. Traughaber testified the corrosion indicated the pole had been moving back and forth. He determined that two of the three aluminum upright members actually broke in two when the pole leaned away from the store in the opposite direction of the banners. He believed the pole failed at its weakest spot, which was in the threads of the base. In his opinion, the load the banners placed on the pole was quite small and was not the cause of the failure.
Ivan V. Pieratt, a structural engineer who previously worked for Walter P. Moore & Associates, testified that Wide-Lite had hired Walter P. Moore & Associates to conduct a computer analysis of thirty and forty-foot steel and aluminum poles during 1971. He testified that his analysis of wind loading on the forty-foot aluminum pole revealed the design of the pole was defective. Concluding that the bracing was inadequate, he found the pole would fail in a 100 mile-per-hour wind because the braces were too far apart. Thus, in Pieratt's opinion, the pole would not be able to withstand the designated 100 mile-per-hour wind load for which it had been designed. After conducting his analysis, Pieratt wrote a letter to Wide-Lite informing it of his conclusion and recommending that additional bracing be used.
Pieratt acknowledged, however, that he did not know whether the pole he tested had the same design and/or properties as the pole which actually collapsed during March of 1991. He stated that the testing he conducted was based on a pole designed with a fillet weld at the base rather than a threaded connection at the base. He explained that the testing he conducted did not involve the physical testing of a pole, but rather was a computer analysis based on input data provided to him by Wide-Lite. He also stated that his wind load testing calculations were based on an assumption that a specific light fixture, the Wide-Lite 4000, was installed on the pole. He noted that his test results would be invalid if a different fixture with different properties had been installed on the pole. Pieratt agreed that it was possible that banners attached to the light pole could have stressed the pole beyond its design capabilities. In his opinion, it was not foreseeable that banners of plastic pendants would be attached to the pole.
Shoemake, the electrical contractor employed by R & M, testified that aluminum poles can collapse from metal fatigue. He explained that they should be visually checked for cracks every two years. When Shoemake installed the additional lighting on the pole during 1990, he checked all of the welds on the pole for cracks but did not see any. He stated that the shopping center owners did not object to him adding the additional light fixtures.
Shoemake explained that the banners were tied below the lights which he had added to the pole. He thought the pole could handle the banners. He and other employees of R & M had attached banners to the pole. He described that the banners were tied "bolstering tight" because *965 of the tendency for them to sag after they had been hanging for a while. He never inquired of Genlyte whether it was safe to attach the banners or lights to the pole. He also stated he never saw any warnings from Genlyte advising not to attach banners to the pole. Shoemake testified that he installs poles for various businesses and, in his opinion, it was foreseeable that someone might attach banners to a pole or that they would modify the lighting on a pole. He acknowledged that no banners or additional lights had been attached to the other light pole in the Sunflower parking lot, which was still standing as of the time of trial.
Frank R. Buccere, an assistant manager of R & M Foods at the time of the accident, testified that the Sunflower store employees would use a truck to hang the banners. One end of each banner was tied to one of the flagpoles on the front of the store, and the other end of the banner was tied to the light pole. He recalled the banners having "some sway" in them when they were attached to the pole.
George Burke, owner of Executive Sign and Lighting, was accepted by the court as an expert in the area of sign fabrication and causation of sign failure. On the day of the accident, he removed the failed pole at the request of Deborah Holtgren, who worked for Poirier, and sent the invoice to Channel Shopping Center. In his opinion, the severe winds that day had caused the pole failure. He described that the pole had broken at the bottom and had fallen toward the store. He recalled having to saw off one of the three legs at the base to remove the pole. He also opined that it was foreseeable that stores would attach banners to light poles as R & M had done.
Martin, one of the owners of R & M, testified he operated the Sunflower store since 1972 or 1973. He stated that he never received any type of warning from Genlyte or Channel Shopping Center advising that the design of the pole was defective or that the banners should not be attached to the pole. He also testified that there were no warnings posted on the pole, and that he had not received any warnings from Genlyte regarding adding or changing lighting on the pole.
Larry Mixon, an R & M store manager, arrived at the accident scene after the pole had been removed from the roof of Cortez's car. He stated that the pole had broken at the bottom above the pedestal base. He said the banners were still attached to the pole, and it looked like it had been pulled out of the base.
Stanley Snodgrass, a risk manager employed by R & M at the time of the accident, testified that R & M had added the additional lights on the pole in question. He was also aware of R & M's ongoing practice of tying the banners to the pole. However, he had no knowledge whether either Genlyte or Channel Shopping Center representatives had been consulted prior to R & M's installation of the additional light fixtures or attachment of the banners.
Donald S. Lanier, assistant manager of the Sunflower store at the time of the accident, testified that there had been no warning from Genlyte that the pole was defective or that the banners should not be tied to it. He also stated that the Poiriers never instructed anyone not to tie banners to the pole, and that the pole itself had no type of warning against the attachment of banners.
Joe Edwards, a district supervisor who had worked for R & M since 1974, testified that R & M had been using the decorative banners since 1974 and had never before had an incident with a light pole.

C. Propriety of the Judgment Notwithstanding the Verdict
In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court reiterated the criteria first set forth in Scott v. Hospital Service Dist. No. 1, 496 So.2d 270 (La. 1986), to be used in determining whether a JNOV has been properly granted pursuant *966 to Louisiana Code of Civil Procedure article 1811:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. (Citation omitted.)
After setting forth the applicable criteria for considering a motion for a JNOV, the trial court concluded:
[T]his court is troubled in only one aspect of the jury verdict, its allocation of 70% fault to [Channel]. As stated above, [Channel] settled with Cortez prior to trial and never made an appearance at trial. Consequently, no evidence of any defense favoring [Channel] was introduced, nor was any evidence of any fault on the part of [Channel] introduced during the trial. The only evidence to the jury concerning [Channel] was via a stipulation that [Channel] was the owner/lessor of the shopping center premises.
Based on the jury answers to interrogatories that Genlyte, the manufacturer, was at fault, this court must conclude the jury felt the light pole in question was defective under a products liability analysis. Given that this factual finding coupled with the knowledge that the shopping center and pole were owned by [Channel] could have been the only basis for any allocation of fault on the part of [Channel], this court must conclude the jury found itself in a proverbial "Catch-22" (who should bear the responsibility for the defective thing, the land owner who relied on the manufacturer to build a reasonably safe product or the manufacturer, who built the defective product.) This requires the resolution of legal issues, which are reserved to the court.
This court is of the opinion that fairness and justice require the manufacturer of a defective product to bear the entire responsibility for the defective product it made and not the landowner, whose premise is defective solely because of the defective product made by the manufacturer. The court will grant the JNOV as it relates to a reallocation of fault by assessing Genlyte, the manufacturer of the defective light pole with both its original jury allocation of 20% and that of [Channel] (70%) for a total allocation of fault to Genlyte of 90%.
In determining whether the trial court erred in granting the JNOV, we consider whether the facts and inferences point so strongly and overwhelmingly in favor of plaintiffs argument in support of the JNOV that reasonable men could not arrive *967 at a contrary verdict. Plaintiff argues there was virtually no testimony regarding any negligence or lack of care on the part of Channel Shopping Center and, thus, there was no evidence to support the jury's assessment of seventy percent fault to Channel Shopping Center. Plaintiff submits there was extensive evidence that the pole was defective and that R & M's actions of adding lights to the pole and tying banners to the poles added stress to the pole, causing it to fail.
Plaintiff contends that if Channel Shopping Center was found to be at fault because the pole was defective based on strict liability principles, such liability should be borne by Genlyte, the manufacturer, based on a products liability analysis. Plaintiff also contends that R & M's third party negligence is a defense to such strict liability and that R & M's actions in adding one-hundred pounds of lights to the pole and stringing the banners to the pole constituted negligence sufficient to relieve Channel Shopping Center of any liability.
Strict liability is based on a theory of responsibility which requires no finding of negligence. Howard v. Allstate Ins. Co., 520 So.2d 715, 717 (La.1988). In the present case, the parties stipulated that the light poles in the shopping center parking lot were under the care, custody and control of the shopping center owners. Thus, the jury did not have to find Channel Shopping Center to be negligent to assess fault to it.
The jury was presented with expert testimony which supported the conclusion that the failure of the pole was caused by the tension of the banners pulling on the pole and the stress of the wind forces acting on the pennants. The jury also was presented with expert testimony from which it could have inferred that the modification of the light pole by the addition of lights weighing one hundred pounds increased the pole's torsional flexibility, causing it to be more likely to fail. Since the jury allocated ten percent fault to R & M, the jury obviously concluded that the failure of the pole was not caused entirely by its defective design or construction.
While plaintiff correctly notes that third party negligence can be a defense to strict liability, plaintiff does not acknowledge that the jury may have concluded that Channel Shopping Center was not only liable based on the principles of strict liability as a result of the pole being defective but also on a negligence basis. The light poles were in the care, custody and control of Channel Shopping Center. The jury may have concluded that Channel Shopping Center was negligent in allowing R & M to engage in the practice of tying banners to the light poles for years without inquiring of the manufacturer whether the light pole was designed to withstand such use. Likewise, the jury may have concluded that Channel Shopping Center should not have allowed R & M to modify the light pole by adding lights without inquiring of the manufacturer whether such modification was safe.
In granting the JNOV, the trial court concluded that the only basis on which the jury could have concluded Channel Shopping Center was liable was as owner of the defective pole, and that it was proper to allocate all fault attributable to the defective pole to its manufacturer, Genlyte. Based on the varying evidence presented to the jury, we conclude the trial court improperly inferred that Channel Shopping Center's liability was based solely on its ownership of a defective pole. Considering all of the evidence, we find the facts and inferences do not point so strongly and overwhelmingly in favor of this conclusion that reasonable men could not have arrived at a contrary verdict; reasonable men could reach a verdict contrary to the trial court's JNOV allocation of ninety percent fault to Genlyte and ten percent fault to R & M. The record does not support the trial court's observation that there was no testimony from which negligence or lack of care on the part of Channel Shopping Center could have been inferred. The jury's assessment of fault to Channel Shopping *968 Center is reasonable and is supported by the record. Accordingly, we conclude the trial court erred in granting the motion for JNOV.[6]

D. Assessment of Fault to R & M
R & M contends the jury and/or the trial court erred in assessing any fault to it, urging that the sole cause of the failure of the pole was that the pole was defective and that all fault should have been attributed to Genlyte. R & M asserts that the testimony of Traughaber and Pieratt established the pole was defective both in design and in manufacture, and that the testimony of Burke and Traughaber established that the attachment of banners to the pole was a foreseeable use of the pole. R & M urges that if the attachment of banners to the pole was a danger to the integrity of the pole, then Genlyte had a duty to place a warning on the pole against attaching banners. R & M maintains that the record establishes that no such warning was ever issued by Genlyte or by Channel Shopping Center. In summary, R & M argues that the attachment of the banners to the pole played no part in its failure; alternatively, if the banners did cause the pole to fail, R & M was not negligent because the failure was not foreseeable to R & M.
In the present case, the jury was presented with more than one permissible view concerning the cause of the pole failure. While the expert testimony of Traughaber and Pieratt support R & M's position that the failure of the pole was due to the pole being defective, the expert testimony of Sabbaghian and Vanderbrook support the position that the failure of the pole was due to the tension caused by the banners pulling on the pole. Additionally, the testimony of Traughaber and Sabbaghian supports an inference that R & M's modification of the light pole by adding the lights contributed to the pole's instability and ultimate failure. The jury apparently concluded that R & M's modification of the pole and/or its actions of tying the banners to the pole was, at the least, one of the causes for the pole failure. Since the record contains evidence to support this conclusion, it is a permissible one which cannot be found to be manifestly erroneous.
R & M argues that it was not negligent in failing to foresee that its actions caused the pole to fail. The testimony established that R & M engaged in the practice of tying the banners to the pole for several years. Although the evidence did not establish the exact number of banners tied to the pole on the day of the accident, the testimony did establish that during these years as many as eighteen banners may have been tied to the light pole at any given time. At least one witness testified that when the banners were attached to the pole, they were pulled tight to compensate for any tendency in the banners to sag. Based on these facts, the jury may have concluded that it was unreasonable for R & M to engage in this practice without first inquiring of Genlyte or Channel Shopping Center whether such practice would affect the integrity of the pole. R & M also modified the light pole by adding lights weighing one hundred pounds without verifying that the pole could withstand the additional stress. Considering these facts, we find no manifest error in the jury's determination that R & M should have foreseen that its actions in tying banners to the pole and/or modifying the pole would affect the integrity of the pole and could cause its failure.
R & M argues that Genlyte and/or Channel Shopping Center had a duty to warn R & M of the dangers of attaching the banners to the pole or modifying the pole. Considering the jury's allocation of fault, we believe the jury may have found *969 some merit in this argument and accounted for it by assessing greater percentages of fault to Channel Shopping Center and Genlyte than to R & M.
Accordingly, we conclude the record supports the jury's allocation of ten percent of the fault to R & M. R & M's answer to the appeal is without merit.

E. Damages

1. Causation
Genlyte and R & M argue that the evidence does not establish that the roof of the car hit Cortez's head, causing her cervical disc problem. Genlyte asserts that Cortez had been treated for severe headaches prior to 1991, suggesting that Cortez's medical problems predated the light pole accident. Genlyte additionally contends that the medical evidence does not establish that Cortez suffered a disc herniation requiring surgical intervention.
During the trial, several witnesses addressed the damage to Cortez's car which resulted from the pole failure. Russell Hoover, the person who disconnected the power to the pole before it was removed from Cortez's car, and Donald Lanier described the roof of plaintiff's car as "caved in." Cortez explained that the driver's seat of her car was adjustable and was raised to the highest position when the accident happened. Cortez stated that when the light pole fell on her car, the roof of the car hit the top of her head. Tom Davidson, an accident reconstruction expert, testified that the car was depressed when the pole fell on it, and the occupant's body would have moved upward toward the roof of the car upon impact.
On the day of the accident, Cortez was examined in the emergency room by Dr. Helen Elizabeth Gaines, who testified that plaintiff complained of neck and upper back pain, forehead pain and the onset of a headache. Dr. Gaines diagnosed a forehead contusion a headache and cervical and thoracic strain secondary to a motor vehicle accident. Anti-inflammatory, muscle relaxer and pain medications were prescribed.
Several days later, when Cortez's head and neck continued to hurt and she began to have problems with her vision, lack of sleep and emotional trauma, she sought medical attention from her family physician, Dr. Patrick Torcson. Dr. Torcson diagnosed muscle strain, muscle contraction headaches and mild posttraumatic stress disorder. Upon Dr. Torcson's suggestion, Cortez sought the advice of a psychiatrist and an orthopedist.
Dr. James B. Denney, a psychiatrist, began treating Cortez on March 26, 1991. He diagnosed posttraumatic stress disorder and depression and testified that these problems were directly related to the light pole accident. Dr. Denney explained that the accident caused Cortez to become fearful of driving, more emotional, irritable, easily angered, and withdrawn. He explained that Cortez also suffered from chronic pain syndrome, which was secondary to her orthopedic problems. He treated her depression and anxiety with prescription medications. Dr. Denney also counseled Cortez regarding problems with claustrophobia that arose during the course of the medical testing for her neck problems.
Dr. Kenneth Adatto, an orthopedist, began treating Cortez on May 14, 1991. He diagnosed a ruptured disc at the C4-5 level. He treated Cortez's symptoms conservatively through the early summer of 1992, and advised that she might eventually need surgical intervention. Dr. Adatto identified the March 1, 1991 accident as the cause of the C4-5 disc becoming painful.
During October of 1991, Cortez consulted with a neurologist, Dr. Maria A. Palmer, regarding her headaches. Dr. Palmer diagnosed muscle contraction headaches secondary to cervical spasm and related the diagnosis to the March 1991 accident. Dr. Palmer testified that while Cortez gave a history of suffering from migraine headaches prior to the accident, the headaches *970 which Cortez described experiencing after the accident were a different type of headache. Dr. Palmer continued to treat Cortez for severe headaches.
During October of 1992, about a year and a half after the accident, Cortez continued to have neck pain and frequent headaches. She sought treatment from Dr. John D. Jackson, a neurosurgeon, who surgically removed the C4-5 disc and performed an anterior cervical fusion. Based on the history related by Cortez, Dr. Jackson testified that the light pole incident caused the C4-5 disc to rupture or bulge.
During 1994, Cortez experienced numbness in both hands, which Dr. Palmer diagnosed as mild carpal tunnel syndrome symptoms brought on by the chronic neck problems. Although the results of Cortez's neck surgery were satisfactory according to Dr. Jackson, at the time of trial during January of 1997, she continued to have neck pain, headaches and difficulty with sleeping.
During the trial, Cortez testified she had not had any accidents or injuries and considered herself to be in good health prior to March 1, 1991. She stated that she had suffered only occasional headaches with pain across her forehead prior to the accident. After the accident, she suffered severe, frequent headaches which were confined to the skull. She stated that she had never had neck pain or sought orthopedic or chiropractic treatment prior to the accident.
Upon reviewing the evidence, we find the record supports the jury's finding that Cortez sustained an injury on March 1, 1991. The jury apparently believed Cortez's testimony that the roof of the car struck her head during the accident. Although the defendants disputed whether Cortez actually had an abnormal disc at the C4-5 level. Dr. Adatto and Dr. Jackson concluded that she did and related the injury to the March 1991 accident. We find no manifest error in the jury's conclusion that Cortez sustained injuries as a result of the light pole accident.
Defendants also dispute whether surgical treatment was necessary as a result of Cortez's injury. However, Cortez explained that she opted to have the surgery, upon Dr. Jackson's recommendation, when her pain became unbearable. The jury apparently accepted this testimony. We find no manifest error in this finding.

2. Amount of Damages Awarded
The jury assessed damages in the following amounts: $120,000.00 for past and future physical pain and suffering, $20,000.00 for past and future mental anguish, $41,000.00 for past medical expenses, $4,000.00 for future medical expenses and $75,000.00 for loss of quality of life.
Both Genlyte and R & M assert that the damages awarded were excessive. They claim that Cortez's mental anguish from the accident was greatly exacerbated by the death of her cousin and her cousin's child in 1991, and by Cortez's witnessing the accidental death of her husband in 1992. They assert these other events greatly affected Cortez's psychological and emotional state but are not related to the light pole accident.
Dr. Denney acknowledged that shortly after the May 1991 accident in which Cortez's cousin and cousin's baby were killed, Cortez reported that her headaches were worse. Dr. Denney described this accident as a significant trauma that focused Cortez's attention on the trauma which she had experienced in March of 1991 related to the light pole accident. Dr. Denney also stated that when Cortez's husband died during August of 1992, she experienced "normal, appropriate grief, which she dealt with in a timely way and in a very efficient way." Dr. Denney stated he was able to distinguish between the grief Cortez experienced as a result of the loss of her husband and the depression she experienced as a result of the light pole accident.
*971 Dr. Denney stated that within a three to six month period following her husband's death, Cortez began to focus less on her husband's death and began taking a more active role in her life. He stated that while the death of her husband was an additional burden for Cortez to bear, it did not cause her posttraumatic stress disorder symptoms to last longer than they otherwise would have. As of March 1995, Dr. Denney found Cortez to be eighty percent recovered from her posttraumatic stress disorder symptoms. However, Dr. Denney testified that as of May 1996, Cortez remained fearful of driving, was still suffering from insomnia related to the posttraumatic stress disorder, and was being treated with an antidepressant medication. Cortez testified during the trial that she was still taking this medication.
Dr. Douglas Stewart, a psychiatrist who conducted an independent medical exam during September of 1994, testified that Cortez suffered from mixed anxiety and depression and a stress-related disorder following the light pole accident. Dr. Stewart believed Cortez's stress-related problems attributable to the light pole incident lasted approximately three to six months after the accident with her physical difficulties continuing after that time. While Dr. Stewart found Cortez's situation was exacerbated by the accidental deaths of her family members, he testified that the injuries Cortez sustained in the light pole accident were the primary cause of her symptoms of depression.
After reviewing all of the evidence, we find no abuse of discretion in the damages awarded. Cortez suffered severe physical and psychological injuries requiring extensive medical treatment. As of the time of trial nearly six years after the accident, Cortez continued to have medical problems related to the accident. With respect to the $20,000.00 award for past and future mental anguish, the record establishes through the testimony of Dr. Denney and Dr. Stewart that the light pole accident caused Cortez to suffer posttraumatic stress disorder symptoms for at least three to six months. The testimony of Cortez's treating psychiatrist, Dr. Denney, supports a finding that Cortez's psychiatric problems resulting from the light pole accident continued for years after the accident. The jury may have placed greater weight on the testimony of Dr. Denney than on the testimony of Dr. Stewart in assessing damages for mental anguish. The jury is afforded this discretion. The record supports the award.

III. CONCLUSION
For the above reasons, we reverse the trial court's January 20, 1998 judgment notwithstanding the verdict and render judgment in accordance with the jury's verdict. R & M Foods, Inc., Sunflower Foods, Inc., and Zurich Insurance Company are assessed one-third of the appeal costs and Genlyte Group Incorporated is assessed two-thirds of the appeal costs.
REVERSED AND RENDERED.
NOTES
[1] Mrs. Cortez's husband, Murphy Cortez, Jr., was initially named as a plaintiff advancing a loss of consortium claim. Prior to the trial, Mr. Cortez died in an accident. During trial, Mrs. Cortez waived this claim.
[2] The record also references this entity as Sunflower Stores, Inc. Although not specifically named as a defendant in plaintiff's petition, Sunflower Stores, Inc. answered the allegations of the petition. Super Value Stores, Inc. ("Super Value") was also named as a defendant as the successor in interest to Sunflower Stores, Inc. The record establishes that the Sunflower store premises were subleased from Super Value by R & M.
[3] The record includes other spellings of this name, including Channell and Chanell.
[4] Many third party demands and cross-claims were filed in the proceedings below but are not at issue in this appeal.
[5] By Acts 1996, 1st Ex.Sess., No. 1, § 1, effective April 16, 1966, La.C.C. art. 2317.1 was enacted to provide that the owner is liable only upon a showing that he knew or should have known of the damage-causing ruin, vice, or defect. Because the accident in this case occurred before the effective date of this statute, we apply the legal principles in effect prior to its enactment.
[6] Based on this determination, we pretermit a discussion of Genlyte's alternative argument that in granting JNOV, the trial court erred in not allocating more than ten percent of the fault to R & M. We also note that while plaintiff argued that the record supported the JNOV, she did not raise the alternative argument that the jury's allocation of fault was manifestly erroneous.