DREW J.
hln this medical malpractice lawsuit, Louisiana State University Health Sciences Center in Shreveport appeals a judgment awarding $1,455,740 for future medical care and related benefits from the date of injury to the date of the verdict, and awarding $517,000 in economic damages.
We reduce the amount awarded for future medical care and related benefits. In all other respects, the judgment is AFFIRMED.
FACTS
After Barbara Wise had been complaining of right shoulder weakness, she was seen by Dr. Anil Nanda, a neurosurgeon who agreed to perform a decompressive cervical laminectomy.
Dr. Nanda first attempted to operate on Barbara on July 6, 2007, but her positioning made it too difficult to continue. A second surgery was attempted on July 9, with Barbara now in a sitting position. During the course of the surgery, Dr. Nanda made a small tear in the dura at level C5-6. The dura is a membrane that covers the spinal cord and the cerebral spinal fluid. Dr. Nanda tried to repair the tear with glue.
Following the surgery, Barbara experienced neurological weakness in her upper and lower extremities. Barbara and her husband, Nathan, were concerned about Barbara’s condition, but Dr. Nanda reassured them that her condition was not unusual and she would soon be back to normal.
On July 23, Barbara was discharged to Promise Specialty Hospital, which treats patients with weak extremities. Dr. Nanda ordered an MRI to be done on August 6. That MRI showed an extensive collection of fluid that was putting pressure on her spinal cord.
| ¡¿Barbara was transferred to Willis— Knighton Hospital on August 7, and two days later, Dr. Nanda performed surgery there to repair the dura tear. Barbara was left with quadriparesis, which is weakness in all four extremities. Barbara returned to Promise on August 31 for continued medical management.
Barbara was admitted to Willis-Knigh-ton on November 7, 2007, for aggressive rehabilitation, and discharged on November 27.
After being home for a few weeks, Barbara took ill on December 15 and was taken to Springhill Medical Center, where she was diagnosed as having blood clots in *632 her legs. She was discharged toward the end of December. Barbara was then admitted to Promise for continued comprehensive medical management and rehabilitation. She was discharged on January 18, 2008.

Lawsuit

The Wises filed separate medical malpractice claims against Dr. Nanda and LSU. The lawsuits were later consolidated. The Medical Review Panel found no violation of the standard of care by Dr. Nanda or LSU.
The matter proceeded to trial by jury in August of 2014. On August 13, the jury found LSU was negligent in the treatment of Barbara and that this negligence was a substantial factor in contributing to the damage she sustained. The jury awarded the following damages: (1) $1,455,740.00 for future medical care and related benefits from the date of injury to the date of the verdict; (2) $1,054,776.00 for future medical expenses and related benefits from the date of the verdict forward; (3) $517,00 for economic loss; and (4) $250,000 for Barbara’s pain and suffering. Those awards were to be |ssubject to the following allocations of fault: LSU-65%, Barbara-10%, and third party-25%.
LSU has appealed, contesting only the award for future medical care and related benefits between the date of injury and the date of the verdict, and the award for economic loss.
DISCUSSION
Regarding the appellate review of an award of general damages, our supreme court has stated:
It is well-settled that vast discretion is accorded to the trier of fact in fixing general damage awards. La. Civ. Code art. 2324.1; Duncan v. Kansas City Southern Railway Co., 00-0066 (La. 10/30/00), 773 So.2d 670. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv. Inc., 99-0934 (La. 10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La. 1979). Only after a determination that the trier of fact has abused its “much discretion” is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La. 1976).
Purvis v. Grant Parish School Bd., 2013-1424, pp. 6-7 (La. 2/14/14), 144 So.3d 922, 927-8.
Regarding the appellate review of an award for special damages, our supreme court has stated:
Special damages are those which have a “ready market value,” such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses 14and lost wages. McGee v. A C and S, Inc., 05-1036 (La. 7/10/06), 933 So.2d 770. In reviewing a jury’s factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual *633 basis for the trial court’s conclusions, and the finding must be clearly wrong. Guillory v. Ins. Co. of North America, 96-1084 (La. 4/8/97), 692 So.2d 1029.
Kaiser v. Hardin, 2006-2092, pp.11-12 (La. 4/11/07), 953 So.2d 802, 810.
I. Damages for future medical care and related benefits
LSU argues the jury committed manifest error in awarding the amount of $1,455,740 for future medical care and related benefits from the date of injury to the date of the verdict.
La. R.S. 40:1237.1, formerly cited as La. R.S. 40:1299.39, provides:
(2) “Future medical care and related benefits” for the purposes of this Section, means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, including drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, to which the injured patient is entitled under the provisions of this Section and which each injured patient needs after the date of the injury. “Future medical care and related benefits” as used in this Section shall not be construed to mean nonessential specialty items, or devices of convenience.
“Future medical care and related benefits” encompasses all past, present, and future medical and related care services necessitated by a qualified health care provider’s negligence, not just what is usually thought of as “future” medical needs. Kelty v. Brumfield, 93-1142 (La. 2/25/94), 633 So.2d 1210.
The fact that medical attention and nursing services have been tendered gratuitously will not preclude the injured party from recovering the value of such services. Edwards v. St. Francis Med. Ctr., 623 So.2d 1387 (La. App. 2d Cir. 1993); Tanner v. Fireman’s Fund Ins. Cos., 589 So.2d 507 (La. App. 1st Cir. 1991), writ denied, 590 So.2d 1207 (La. 1992). However, a claim for nursing care rendered gratuitously by nonprofessional family members must be viewed with close scrutiny. The need for services must be shown, the reasonableness of the fee must be established, and the extent and duration of the services must be proven. Edwards, supra; Tanner, supra.
LSU contends there was insufficient evidence of the need for nonprofessional family custodial care, and no evidence to establish a reasonable rate or the extent or duration of such care. LSU concedes that $464,096.88 in past medical expenses were incurred, and argues that the award for future medical care and related benefits up to the date of the verdict should have been limited to that amount.

Need for services

According to Nathan, a lift was used to get Barbara in and out of the bed at Willis-Knighton, as shown by a photo from August 20, 2007. A photo taken the next month at Promise showed Barbara sitting upright on a bed, but Nathan recalled that she still needed help getting in and out of it.
According to Nathan, when Barbara returned home on November 27 by ambulance, all she could do was stay in her bed. She could not get herself into the wheelchair.
When Barbara returned to Promise following the blood clots, she underwent occupational and physical therapy. There, she was able to walk up to 150 feet with stops to rest, someone standing on each side of her, and a third person following her with a wheelchair in case she fell.
The discharge summary from Promise in January stated that Barbara had pro- *634 grossed well in therapy. Her occupational therapy discharge summary reflected that she needed moderate assistance with feeding andlfiinaximum assistance with grooming, upper and lower extremity dress, bathing, and toileting. Her physical therar py discharge summary stated she was independent with wheelchair mobility, needed minimal to moderate assistance with bed mobility, supervision with transfers with proper setup, and supervision and minimal assistance with ambulation. The physical therapy summary further stated that her sitting balance was good to fair and her standing balance was fair.
Nathan testified that he was determined to get Barbara walking again since they were told she would never walk and would have to go to a nursing home. After workers at Promise showed him how to help her, he turned their living room into a gym with ropes and pulleys, weights, and a slide bar fastened to her piano.
Roger Malone, who has known the Wises for about 15 years and sees them almost every day, testified that Barbara walks slowly because she drags or scoots her feet when using her walker. She would sometimes hold onto furniture to steady herself, so Nathan arranged the furniture to allow her to walk from one piece to the next.
Nathan constructed a ramp at their house to make it easier for Barbara to enter and leave. However, he removed the ramp when she expressed fear that she would slip on it. He also lowered each step because she was having trouble handling them. She can ascend and descend the stairs by turning sideways and holding onto the rail with both hands.
Dr. Marco Ramos, a neurosurgeon who examined Barbara on July 16, 2012, noted that her ambulation was very labored and difficult. She needed help getting out of her wheelchair. His diagnosis was incomplete quadriparesis.
17Yolanda Palmer, a former student, saw Barbara pushing a buggy at the grocery store and knew something was wrong with her because Barbara was holding onto the buggy the entire time and was moving slowly. Palmer later saw Barbara at Wal-Mart, possibly in early 2013. Although Barbara appeared to be walking somewhat better, she was still holding onto the buggy and still appeared to have mobility issues.
Karen Luckett, who prepared the life care plan and testified as an expert in life care planning and occupational therapy, found Barbara’s ambulation and standing balance to be impaired. She noted that Barbara needs the walker, and that she walks very slowly with it.
Dr. David Law, Barbara’s treating physician, considered Barbara to be a fall risk because her gait is somewhat weak and unstable, she needs a walker to balance and to walk well, and she has a history of falls. Dr. Law did not think she could get herself up after a fall because of the weakness in her extremities. That weakness also made it difficult for her to get in a protective position as she fell. Luckett thought she had a very high fall risk. Barbara has fallen at night while Nathan was sleeping; outside help often had to be summoned to get her upright again.
Barbara sleeps in a hospital bed placed next to Nathan’s bed. Nathan has to assist her in getting in and out of the bed. Luck-ett noted that Barbara needs a lot of help from Nathan to get her legs into bed. She can move her legs off the bed and let gravity pull them down, but she still needs Nathan to help lift her up from a lying position. She can get up from bed and from a chair if she is put into a sitting position.
When Barbara first returned home from the hospital, she frequently could not con *635 trol her bowels. Nathan had to clean the floor many times ^because vomiting and diarrhea would follow her spasms and he could not get her from the bed to the bathroom in time. She now wears adult diapers.
Barbara’s deficits were not limited to her lower extremities. Barbara explained that her right hand works pretty well, but her right arm is limited. She can use her left thumb and first two fingers to pick up a few things, and she can lift her left arm if she goes sideways. Luckett found her left hand to be very spastic.
Barbara testified that at first her left hand was closed up like a fist, but Nathan was determined to open it, so he put a pencil in her hand and she carried the pencil or slept with it. He replaced the pencil with subsequently larger items until her left hand could open up somewhat. Also, in order to improve Barbara’s use of her hands and fingers, Nathan would have her search for coins in a bowl of rice or beans. There was another bowl of paper clips, screws, nuts and bolts that she had to separate while blindfolded.
Her impaired left hand affects her daily living activities. She needs help to get completely dressed. Nathan has to help pull up her panties and pants. She cannot get clothes over her head, so Nathan does that for her. She also needs someone to put her shoes and socks on for her.
Barbara needs assistance with going to the bathroom. Nathan has to clean her when she is finished, and pull her pants up for her. Nathan has installed bars next to the toilet help her to rise, but she still needs help getting up. When she uses a public restroom, someone has to accompany her.
Barbara can comb only the front of her hair. Luckett noted that she also needs help with bathing because she cannot get her legs into the tub and has to be careful reaching forward to turn the knobs because of her balance 19issues. Barbara added that she cannot scrub her own back or reach down to scrub her feet.
Barbara can make a sandwich and peel vegetables, but she cannot really function in the kitchen by herself. She can lean against the sink with her stomach to steady herself while standing at it. She can push down on food with a butcher knife, but to prevent cutting herself, she does not otherwise cut food with a knife while preparing it. She has burned herself when trying to take cookies from the oven, when she fell against the oven door. Roger Malone described that Nathan would set a pan out for her, she could add the ingredients, and he would put it in the oven. She is unable to lift a large pot.
Barbara can fold dish towels and bath towels. She can collect the laundry by picking up the dirty clothes with a stick and then placing them on a rolling chair. She can put those clothes in the washing machine along with detergent and turn the machine on, but Nathan has to remove them from the washer and put them in the dryer for her.
Barbara has resumed doing some calligraphy and painting, but she is limited to little postcards instead of big canvases. The painting materials also have to be brought to her.
Once Barbara regained some strength, she decided she wanted to drive again. It took her six to eight months to learn how to turn the steering wheel. Although she was able to start driving again, Dr. Law remarked that driving a ear, and getting in and out of it, are two different things. She needs assistance getting herself and her walker or wheelchair in and out of the car. Her troubles entering and exiting the vehicle come from having limited ability to pivot her legs. Barbara considered it a *636 chore to get in her vehicle. ImShe described how she can pretty much get her feet into the vehicle by lying on the center armrest, and then holding onto the steering wheel to pull herself upright. Nathan replaced her vehicle with a Jeep Cherokee, which was easier for her to get in and out of. She sometimes uses a golf cart to move around outside, and Nathan -will ride in it with her and hold her.
Barbara and Nathan opened a barbeque restaurant for about six months in 2010. She worked there about three days a week, and when she worked depended on how she felt. Her duties were to sit at the order window, take the orders, and collect the cash. The restaurant closed after the landowner sold the property. When she worked at the restaurant, employees would help her to the car, and then she would drive herself home where Nathan would be waiting.
Linda Morgan, Barbara’s sister, testified about Barbara’s limits when she stayed with her within a year of trial. She sometimes Jiad to assist Barbara to the bathroom, but Barbara could often hold onto furniture while walking down the hall to the bathroom. Barbara usually woke her up when she had to go to the bathroom. Linda helped Barbara get dressed, fix her hair, take a bath, and clean up after using the bathroom. Linda noted that when something is handed to Barbara, it must be placed firmly in her hand; when she hands you something, you have to pull it from her hand because she cannot let go of the item.
Dr. Law testified that he thought Barbara has a long-term need for occupational therapy and physical therapy. Luckett testified that Barbara has reduced stamina and needs moderate to maximum assistance for regular everyday self-care. The jury was shown a short video of Barbara at home that was prepared by Luckett as part of her assessment.
Inin determining how much care Barbara would need going forward, Dr. Law thought 4-6 hours per day of assistance was sufficient. He testified that her independent personality—not wanting someone around all the time—was a factor in coming up with that number. He agreed that she really did not need to be left alone. He would defer to Luckett on the number of hours of home assistance needed.
Luckett did not think that Barbara could be left alone for more than a few minutes because of the level of assistance she required. She believed that Dr. Law’s assessment was based on an assumption that her husband would be there for the rest of the time. She thought Dr. Law’s 4-6 hours of daily assistance meant a person being there in addition to Nathan being there the rest of the time.
We disagree with LSU. There was abundant evidence showing Barbara’s need for nonprofessional family custodial care from the date of injury until the date of the verdict.

Reasonableness of the fee

LSU contends that the jury calculated the award for care by using the $18 per hour figure suggested by Luckett. Luckett obtained that figure after calling two agencies in Springhill. One charged $15 per hour, and the other charged $22 per hour. She averaged those estimates to reach $18.
It was unreasonable for the jury to use that figure. Luckett said that in her training as a life care planner, she was taught not to rely on private sitters because they come and go too easily and it is difficult to replace them at a moment’s notice. She found it was better to rely on a company who can ensure someone will be there.
*637 112Luckett also testified that as a life care planner she takes the family out of the picture. She cannot rely on Nathan to be there, but she still valued his time as a caregiver the same as she valued the time of a person assigned by a service.
While those considerations may have been valid when calculating the cost of future care going forward from the date of the verdict, the jury was also tasked with assigning a value to the care largely provided by Nathan, who was a nonprofessional and who was not employed by an agency, from the date of injury to the verdict date. In light of this, we believe $8 per hour would have been the highest reasonable rate to use for the period at issue.

Duration and extent of the care

Although there were times when Barbara was alone during the relevant period, the record shows that was generally not the case.
Linda Morgan testified that she spent about every third night at LSU so Nathan could go home to take care of business and rest. Barbara felt like she was a burden on Nathan when at Promise since he was there day and night.
Dr. Law noted when he saw Barbara on December 6, 2007, she was getting professional home health care from a Springhill agency.
An invoice from Professional Home Health Services of Springhill for services in 2008 reflects that Barbara received four physical therapy visits from January 30 to February 6, three occupational therapy visits between January 29 and February 5, skilled nursing visits on January 31 and February 6, and four home health aide visits between January 30 and February 6.
Nathan was very involved in his wife’s care. He not only met her daily needs, but he also made modifications to the interior and exterior of 11stheir house to make Barbara’s life easier. For example, Nathan lowered part of the kitchen counter so she could prepare food while sitting down, and he also lowered the cabinets so she could reach the first shelf.
Margie Clements, Nathan’s sister, testified that Barbara could not do anything when she was first discharged home. Nathan had to spoon-feed Barbara and clean her after she used the bathroom. He could not leave her alone at the time.
Barbara acknowledged that she would not have developed the strength to walk again without Nathan’s help. Dr. Law testified that Nathan has been very supportive of Barbara, and she made great strides because of his help and her determination. Even Linda Morgan, who was called to testify by LSU, stated that Nathan took good care of her sister and stood by Barbara through all of her therapy and hospitalizations.
Nathan’s morning routine is to awake Barbara and take her straight to the bathroom, clean her up, give her a bath, dress her, and then bring her to the kitchen for breakfast.
Barbara testified that Nathan would usually accompany her when she went shopping, although Palmer thought Barbara was alone the time she saw her at the grocery.
Nathan testified that he would usually hire someone during the day to stay with Barbara if he had to go out or was occupied with the farm. When he worked driving a truck, he would usually leave someone with her. Barbara said she would sometimes stay by herself at those times, but her brother lived next door and could help.
Luckett recalled hearing that a housekeeper went to Barbara’s house once a week for the last five to six years. In addition, a woman would sometimes *638 spend Tuesday nights with Barbara so Nathan could attend a prayer breakfast the next morning.
Friends, family, and even a couple of volunteers would sometimes stay with Barbara. Roger Malone testified that he would miss work if they needed his help.
Linda welcomed her sister into her Plain Dealing home and cared for her for two months in 2013 when Barbara and Nathan separated because of stress. Following Nathan’s back surgery, he asked her to return home to lend emotional support. She returned home before Thanksgiving. A lady then lived with them for a short time.
LSU made the following argument in its appellate brief regarding this issue:
The jury awarded $1,455,740.00 for future medical care and related benefits from the time of injury until the time of trial/jury verdict. If the total past medical expenses [464,096.88] are removed from this total award, there remains $991,643.12. While “past custodial services/expenses” were argued to the jury, there is no other way to explain the amount of the award in this particular item of damage. If the $18 figure for professional services to be rendered to Mrs. Wise in the future is used, the calculation for the six (6) year period between the date of injury and the time of trial/jury verdict gives a figure of approximately $950,000.00. This is within approximately $40,000.00 of the remaining amount of the award for future medical care and related benefits from the time of injury until the jury verdict if the actual past medical expenses are removed. While no one knows exactly what the jury did to arrive at this figure, this is the most logical way to approximate the figure awarded by the jury.
Using LSU’s assumption of an $18 rate, the jury would have awarded that rate for less than 24 hours per day. LSU mistakenly stated there were six years between the date of injury and the date of the verdict. In fact, there were over seven years or 2,592 days between the July 9, 2007, injury and the August 13, 2014, verdict. That works out to an average of 21.26 hours of lificustodial care per day that was provided. We cannot conclude that a finding of that extent or duration of care was unsupported by the record.
Accordingly, using the aforementioned $8 per hour, we amend the award for future medical care and related benefits from the date of injury to the date of the verdict to reduce it to $904,944.24, representing $440,847.36 for the custodial care plus $464,096.88 for past medical expenses.
II. Economic loss
LSU contends that the jury was manifestly erroneous in awarding economic damages of $517,000 when the evidence justified only an award of $46,378, representing one year of economic loss. LSU points out that Barbara, who was born on October 13,1942, and nearly 65 at the time of injury, was already a retired teacher. Referring to section 515" of Title 28, Part CXV of the Louisiana Administrative Code, “Teachers’ Retirement System Part-Time, Seasonal, or Temporary Classroom Teacher,” LSU argues that as a rehired retiree, Barbara could only be employed in areas where there was a certified shortage of qualified teachers.
This section states, in relevant parts:
C. Rehired Retirees
1. Any retired member of TRSL, other than a retired teacher as defined in R.S. 11:710, who returns to active service covered by TRSL, shall have retirement benefits suspended for the duration of reemployment.
2. In order for a person who qualifies as a retired teacher because he teaches *639 in a shortage area to receive benefits during the period of her or his reemployment, the superintendent and the personnel director of the employing school must certify to BESE and the TRSL board of trustees that a shortage of teachers exists in the area in which the retired teacher was hired to teach. For speech therapists, speech pathologists, and audiologists in a shortage area, the employer is required to certify that a shortage of such persons exists.
luiEven if it is assumed that Barbara wanted to be considered a retired teacher so that she would continue to receive her retirement benefits, it must be considered that besides teaching home economics for 42 years, she was also certified in social studies and could teach English and science because she had 30-plus hours in those subjects. This greatly expanded her potential teaching opportunities. In addition, as shown by her teaching stint in Arkansas, Barbara may not have limited herself to Homer High School or the Claiborne Parish District for teaching opportunities.
After retiring in 2005, Barbara wanted to teach again because she missed interacting with the children. She had planned to teach in the fall of 2007 and had obtained a position. She wanted Dr. Nanda to perform the surgery as soon as possible so she would be ready in August for the school year. Margie Clements, who was a teacher and a principal in Natchitoches, testified that they talked about teaching all the time, and Barbara was looking forward to going back to the classroom.
Barbara had been teaching at Homer High School, and she recalled that the principal there, D.B. Mitchell, said that she could have a job there any time that she wanted one. Mitchell wrote to her on July 27, 2007, that the position would still be hers until she was able to return or notified him that she could not return.
Barbara said she wanted to work until she was 75, and she would play it by ear as long as her health was good. She did not pick that age out of the air, but thought she would like to teach until 75 because that would cover the payments for the house they were going to build. She would have considered teaching past the age of 75 if she felt like it.
_JjjAfter reviewing the record, we cannot conclude that the jury was manifestly erroneous in awarding $517,000 in lost wages.
CONCLUSION
We amend the award for future medical care and related benefits from the date of injury to the date of the verdict to reduce it to $904,944.24. In all other respects, the judgment is affirmed. Each party is to bear its own costs.[1]
JUDGMENT AMENDED, AND AS AMENDED, AFFIRMED.

. The appellate court costs in the amount of $649.00 are to be paid by appellant in accordance with La. R.S. 13:5112.