# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2023 CA 0890

## ROBIN OLDENBURG, WIFE OF/AND GAIR OLDENBURG

### VERSUS

## MOHAMED ELKERSH, M.D. AND ADVANCED PAIN INSTITUTE TREATMENT CENTER, LLC AND ITS EMPLOYEES, AGENTS AND/OR STAFF

*DATE OF JUDGMENT:* **JUL 0 2 2024**

ON APPEAL FROM THE TWENTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF TANGIPAHOA, STATE OF LOUISIANA
NUMBER 2015-0002245, DIVISION C

HONORABLE ERIKA SLEDGE, JUDGE

\* \* \* \* \* \*

| | |
|---|---|
| Katie Lewis Hebert<br>Amanda K. Hamm<br>James A. Marchand, Jr.<br>Frank E. St. Phillip, II<br>Covington, Louisiana | Counsel for Plaintiffs-Appellees<br>Robin Oldenburg, wife of/and<br>Gair Oldenburg |
| Keith C. Armstrong<br>Joseph R. Dronet<br>Baton Rouge, Louisiana | Counsel for Intervenors-2nd Appellants<br>Louisiana Patient's Compensation<br>Fund and Louisiana Patient's<br>Compensation Fund Oversight Board |
| Tonya Kilpatrick Gallaspy<br>Metairie, Louisiana | Counsel for Defendant-Appellant<br>Mohamed Elkersh, M.D. |
| Harry J. Philips, Jr.<br>Ann Michelle Halphen<br>Amy Collier Lambert<br>Shelby G. LaPlante<br>Savannah W. Smith<br>Baton Rouge, Louisiana | |

\* \* \* \* \* \*

BEFORE: GUIDRY, C.J., CHUTZ, AND LANIER, JJ.

Disposition: AFFIRMED.

**CHUTZ, J.**

Defendant-appellant, Dr. Mohamed Elkersh, and intervenors-appellants, the Louisiana Patient's Compensation Fund (PCF) and the Louisiana Patient's Compensation Fund Oversight Board (collectively intervenors), appeal the trial court's judgment, rendered after a jury verdict concluded that Dr. Elkersh had breached the standard of care, causing damages to plaintiffs-appellees, Robin Oldenburg and her husband, Gair Oldenburg. Dr. Elkersh and intervenors (collectively appellants) appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2015, the Oldenburgs instituted this malpractice lawsuit, naming Dr. Elkersh as a defendant.[1] According to the allegations of the petition, on November 7, 2012, Robin presented to Dr. Elkersh at his facility, Advanced Pain Institute Treatment Center, LLC (API), for an injection into her neck.[2] Following the procedure, Robin had weakness in her right upper extremity and could not raise her right arm or grip with her hand. Dr. Elkersh advised the Oldenburgs that the symptoms were related to anesthetic toxicity and discharged her. The next morning, Robin reported to API that her symptoms had not abated. An appointment with Dr. Elkersh and an MRI were scheduled. After the MRI results were reviewed by Dr. Elkersh, he contacted the Oldenburgs, advising Robin to go to North Oaks Medical Center. Robin was treated with IV steroids as well as physical and occupational therapy for spinal cord edema. On November 13, 2012, Robin was discharged from the hospital with continued complaints of right-sided

---

[1] The Oldenburgs alleged, and it is undisputed that Dr. Elkersh is a qualified health care provider under the Louisiana Medical Malpractice Act. A medical review panel (MRP) was convened, and on April 13, 2015 rendered its opinion. The Oldenburgs' petition included an averment that the petition had been filed in accordance with La. R.S. 40:1299.47(A)(2)(a).

[2] Although API, a qualified health care provider, was named as a defendant, the jury concluded that API's breach in the standard of care was not a proximate cause of Robin's damages. The trial court's judgment dismissed API from this lawsuit, and that dismissal has not been appealed.

2

upper extremity deficits. In their petition, the Oldenburgs aver that Dr. Elkersh breached the standard of care causing injury to Robin.

On September 10, 2015, Dr. Elkersh answered the lawsuit, generally denying the allegations of the petition and raising affirmative defenses. He also requested a jury trial.

The trial court issued a scheduling order on December 7, 2021, setting the matter for a jury trial during the week of August 8, 2022, with a discovery cutoff date of June 13, 2022. A final pretrial conference was also set for August 8, 2022. Prior to empanelment of the jury, the parties participated in a pretrial motions hearing on August 8, 2022, wherein the trial court permitted some evidence and excluded other evidence.

A four-day trial on the merits was held, commencing on August 9, 2022, after which the jury rendered a verdict in favor of the Oldenburgs, awarding total damages of $3,985,000.00, which included $2,500,000.00 for Robin's past and future general damages and $200,000.00 to Gair for his loss of consortium damages.[3] On September 2, 2022, the trial court signed a judgment in favor of the Oldenburgs and against the PCF in the reduced amount of $400,000.00 for the Oldenburgs' excess general damages.[4] On October 31, 2022, intervenors filed a petition of intervention. A motion for judgment notwithstanding the verdict alternatively new trial and/or remittitur, challenging the excess general damages

---

[3] The jury specifically itemized Robin's general damages, awarding $750,000.00 for pain and suffering (past and future), $750,000.00 for mental anguish and emotional distress (past and future), $500,000.00 for permanent disability, and $500,000.00 for loss of quality of life (past and future). The jury quantified Gair's loss of consortium, awarding $100,000.00 for loss of companionship, love, and affection and $100,000.00 for loss of services.

[4] The trial court judgment awarded the Oldenburgs general damages totaling $500,000.00 pursuant to La. R.S. 40:1231.2(B)(1), leaving in place the jury's awards for past and future medical expenses. See *Williams v. Enriquez*, 40,305 (La. App. 2d Cir. 11/17/05), 915 So.2d 434, 437. The application of the statutory limitation of liability, the quantum of $100,000.00 awarded against Dr. Elkersh pursuant to the limitation of liability contained in La. R.S. 40:1231.2(B)(2), and the order directing the PCF to pay Robin's future medical care and related benefits in accordance with La. R.S. 40:1231.3(C) have not been not appealed.

filed by Dr. Elkersh was denied by the trial court on November 28, 2022.[5] Dr. Elkersh and the intervenors appeal.

## EVIDENTIARY RULINGS

Without asserting that the jury's liability determination was manifestly erroneous, on appeal appellants limit their liability challenge to three evidentiary determinations made by the trial judge, asserting that the rulings so tainted the jury's verdict that they warrant a de novo review by this court. Thus, we consider each of these trial court rulings.

### Exclusion of Dr. Koga's Opinions and Trial Testimony:

Generally, the trial court is granted broad discretion in making evidentiary rulings. The trial court's determinations will not be disturbed on appeal absent a clear abuse of discretion. An abuse of discretion results from a conclusion based on an erroneous view of the law or from a conclusion reached capriciously or in an arbitrary manner. "Arbitrary or capricious" means the absence of a rational basis for the action taken. *City of Baton Rouge v. Mucciacciaro*, 2021-0656 (La. App. 1st Cir. 5/25/22), 342 So.3d 955, 963-64, writ denied, 2022-01172 (La. 11/1/22), 349 So.3d 2.

The trial court's discretion in controlling the admission of expert testimony is well established in Louisiana jurisprudence. See La. C.E. art. 702. The trial judge is vested with broad discretion in ruling on the scope of expert testimony. However, if the exclusion of evidence taints a trial court's findings, this court steps into the shoes of the fact finder and conducts a de novo review of all admissible evidence to ensure a fair trial and fair judgment. *Mucciacciaro*, 342 So.3d at 964.

Both Dr. Elkersh and the intervenors complain that the trial court erred in granting the Oldenburgs' motion in limine, striking the report and the anticipated

---

[5] The trial court granted the motion for remittitur in part and reduced the past medical expenses award of $385,000.00 rendered in the September 2, 2022 judgment to $384,808.55. The past medical expenses award has not been appealed.

trial testimony of defendants' expert neurosurgeon, Dr. Sebastian Koga. The basis of the trial court's exclusion was that the expert's report was provided after the discovery cutoff date.

If a party's attorney fails to obey a pretrial order, the court, on its own motion or on the motion of a party, after hearing, may make such orders as are just, including an order prohibiting the disobedient party from introducing designated matters in evidence. La. C.C.P. art. 1551(C). See also La. C.C.P. art. 1471(A)(2). A trial court renders a pretrial order after holding a pretrial conference, and the order "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." La. C.C.P. art. 1551(B). The theory inherent in pretrial procedure is to avoid surprise and to allow orderly disposition of cases. *Morgan v. E. Baton Rouge Par. Sch. Bd.*, 2016-1065 (La. App. 1st Cir. 2/17/17), 215 So.3d 442, 444, writ denied, 2017-0457 (La. 5/1/17), 219 So.3d 330.

A reviewing court must defer to a trial judge's reasonable decision on a question or matter properly within his or her discretion. *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067, 1071 (La. 1983). In matters of discovery, decisions of the trial court should not be disturbed in the absence of an abuse of discretion. See *Dennis v. Turner*, 35,553 (La. App. 2d Cir. 1/23/02), 806 So.2d 942, 944. Given the varying factual circumstances and the discretionary nature of each such decision, when the trial court's ruling is a "close call," it rarely can be considered a gross abuse of discretion. See *Palace Properties, L.L.C. v. Sizeler Hammond Square Ltd. P'ship*, 2001-2812 (La. App. 1st Cir. 12/30/02), 839 So.2d 82, 91 n.14, writ denied, 2003-0306 (La. 4/4/03), 840 So.2d 1219.

5

Here, it is undisputed that, despite a discovery cutoff date of June 13, 2022, Dr. Koga was not identified as a medical expert until May 31, 2022.[6] By joint motion, the discovery cutoff date was extended until July 13, 2022.

On June 6 and 7, 2022, counsel for plaintiffs were provided the deposition and report fees they had requested of Dr. Koga. Also included in a June 7, 2022 email, defense counsel noted, "Please let us know if you would like a report instead of or in addition to the deposition." In a June 9, 2022 email, plaintiffs' counsel advised defense counsel to have Dr. Koga prepare a written report and to provide deposition dates after the anticipated issuance of his report.

On June 13, 2022, plaintiffs' counsel emailed defense counsel requesting available deposition dates for Dr. Koga and whether he required prepayment for the requested report. In response, defense counsel stated, via email dated June 17, 2022, that Dr. Koga was available at 9:30 a.m. on July 11, 2022, pointing out that it was the same date the plaintiffs' expert, Dr. Christopher Gharibo, was providing perpetuation of his testimony, scheduled for 2:30 that afternoon.

Defendants supplemented their responses to interrogatories and requests for production on June 20, 2022. Defendants identified Dr. Koga as:

> expected [to] ... provide opinion testimony in response to the allegations regarding treatment of [Robin] and [Robin's] history, condition, and course, specifically including expert opinion testimony regarding standard of care and causation issues, that the patient experienced a rare but known complication which was timely diagnosed and properly managed resulting in improvement. **Please see deposition and report.** [Emphasis added.]

An email from plaintiffs' counsel to defense counsel dated June 21, 2022 indicated that an updated copy of November 10, 2012 MRI and CT of Robin's cervical spine was available to retrieve. The email pointed out plaintiffs'

---

[6] The Oldenburgs acknowledge that after the identification of Dr. Koga, on June 6 and 8, 2022, they identified two additional medical expert witnesses.

understanding that Dr. Koga had been unable to review the images since defendants' copy was in a corrupt condition.

On July 1, 2022, responding to defense counsel's June 17, 2022 email, counsel for plaintiffs advised that Dr. Koga's report was needed prior to the July 11, 2022 perpetuation of Dr. Gharibo's testimony and requested the status of the report. That same day, defense counsel replied by email that the report was expected to be forwarded to plaintiffs' counsel the following week. Defense counsel acknowledged the need to have the opinion before the perpetuation of Dr. Gharibo's deposition testimony on July 11, 2022, and offered to file a motion to briefly extend the deadline to complete the perpetuation of video testimony that was to be played for the jury at trial. Plaintiffs' counsel responded, "As long as we have [Dr. Koga's] report next week, extending the deadline should not be necessary."

The next communication was an email from plaintiffs' counsel to defense counsel on July 8, 2022, requesting the status of Dr. Koga's report, with a reminder of the July 11, 2022 perpetuation of Dr. Gharibo's trial testimony, that the report was needed to provide Dr. Gharibo "an opportunity to address Dr. Koga's opinions," and pointing out that it had been a month since Dr. Koga's report had been requested. On July 11, 2022, defense counsel emailed plaintiffs' counsel, explaining Dr. Koga's report had not yet been received but that if the report were received and defendants planned to call Dr. Koga at trial, defense counsel would produce the report "and we can discuss applicable remedies."

On July 14, 2022, the day after the discovery cutoff date and three days after perpetuation of Dr. Gharibo's testimony, defense counsel emailed a copy of Dr. Koga's report to plaintiffs' counsel. Plaintiffs' counsel replied on July 18, 2022, inquiring whether Dr. Koga was to testify as to the standard of care. In a response

that same day, defense counsel stated, "Dr. Koga will testify with regard to standard of care and causation issues in response to the opinions of [five of plaintiffs' identified experts]."

An email between defense counsel, dated July 19, 2022, stated that plaintiffs' counsel was "going to forward some language, so we can work out a Consent Judgment for the scope of Dr. Koga's testimony as to standard of care." Counsel then provided the following as an example of language she had offered for the proposed consent judgment, "He doesn't do procedure, so would not testify as to the needle selection or technique, but would testify as to standard of care (more broadly)." The record is devoid of any communication from defense counsel to plaintiffs' counsel indicating the gist of the email or an intention to enter a consent judgment by plaintiffs' counsel. Similarly, nothing in the record establishes the intended scope of counsels' discussions.

In rendering its ruling, the trial court stated:

> Yes, the plaintiffs could have taken Dr. Koga's deposition; however, they requested his report. They requested it numerous times. And I'm not saying they were intentionally misled. Not at all. But they were told that the report would be provided prior to Dr. Gharibo's deposition. One date [for a deposition] was provided. It was the same date ... as Dr. Gharibo's deposition.
> It's difficult to reschedule a doctor's deposition. They have demanding schedules and places that they need to be, and so ... there was definitely an effort, a significant effort on the part of the plaintiffs to obtain the information. Repeated requests for the report. They were told they would get it ..., and then it was provided after discovery cutoff.
> At this point, it's my understanding that Dr. Gharibo is out of the country. Even if he could get on Zoom, he may not want to do that. He may be on vacation or visiting with his family. He is not a party to this litigation. He's an expert, and we're at the eleventh hour....
> So it's going to be the Court's ruling that the plaintiffs' motion to exclude Dr. Koga is granted.

We cannot say that the trial court abused its discretion in excluding Dr. Koga's opinion and anticipated trial testimony under these circumstances.

While the late identification of medical experts by counsel for the parties created a tight schedule, they collectively agreed to the extended discovery deadline. Insofar as appellants' contention that plaintiffs independently requested a report rather than deposition testimony, the record establishes that it was defendants who suggested "a report instead of or in addition to the deposition," and that defendants agreed to supply the report prior to Dr. Gharibo's July 11, 2022 testimony perpetuated for trial. Additionally, defendants provided plaintiffs with only a single deposition date, the morning of July 11, 2022, which would not have allowed Dr. Gharibo the opportunity to review the testimony so as to rebut Dr. Koga's standard of care and causation opinions. And as noted by the trial court, plaintiffs repeatedly made efforts to obtain Dr. Koga's report prior to the perpetuation of Dr. Gharibo's testimony. Therefore, the record shows that the late report caused prejudice to plaintiffs.

We are mindful that even when the trial court's ruling is a "close call," its decision rarely can be considered a gross abuse of discretion. In light of the sequence of events during discovery, given the trial court's ruling, this court must uphold the exclusion of Dr. Koga's report and anticipated trial testimony.[7]

---

[7] Intervenors assert that because plaintiffs did not comply with La. C.C.P. art. 1425 by filing a contradictory motion requiring that Dr. Koga provide an expert report, defendants had no codal obligation to produce the expert report and, thus, its late production did not constitute a violation of the scheduling order. Intervenors overlook that defendants voluntarily agreed to produce the expert report and created an expectation of timely production. Defendants acknowledged plaintiffs' need for the report prior to the perpetuation of Dr. Gharibo's testimony. They offered only a single deposition date that did not allow the rebuttal witness an opportunity to review Dr. Koga's testimony. Most importantly, defendants agreed to supply the report before July 11, 2022. Therefore, irrespective of whether defendants had a codal obligation to produce the report, defendants expanded the scope of discovery to include production of the report, and plaintiffs were prejudiced when it was not timely produced. Therefore, the trial court did not abuse its discretion in finding a violation of the scheduling order and excluding Dr. Koga's trial testimony and opinions on this basis.

9

Accordingly, we find no error.[8]

## Exclusion of a Demonstrative Evidence During Dr. Markman's Testimony:

During defendants' direct examination of Dr. John Markman, an expert in the fields of neurology and pain management, an exhibit showing the blood vessels in the back of a person's neck was presented to the jury by projection onto a screen. Defendants' proffer of the demonstrative exhibit shows two illustrations with a caption below which states, "Corrosion cast of the dural venous sinuses and vertebral venous plexus (left) and schematic drawing (right) showing the connections between the emissary veins of the posterior occipital region and vertebral venous plexus."

Plaintiffs' counsel requested a sidebar, objecting to the presentment of the demonstrative evidence because it had not been produced during discovery. Defense counsel stated that she "got [the exhibit] last night." Plaintiffs' counsel

---

[8] Additionally, the record is devoid of a proffer of Dr. Koga's trial testimony. Without a proffer, appellate courts have no way to ascertain the nature of the excluded testimony. *Salvador Valencia, LLC v. Robertson Dev., L.L.C.*, 2022-0489 (La. App. 1st Cir. 12/22/22), 360 So.3d 555, 561. See also La. C.C.P. art. 1636. At the pretrial hearing, Dr. Koga's report was admitted into evidence without objection. Without Dr. Koga's testimony, the report is hearsay. See *Brasseaux v. Stand-By Corp.*, 371 So.2d 1174, 1175 (La. 1979). See also La. C.E. art. 803(6). But because plaintiffs failed to object to its admission, they waived the objection. See *Achee v. Nat'l Tea Co.*, 95-2556 (La. App. 1st Cir. 12/20/96), 686 So.2d 121, 126 n.5. See also La. C.E. art. 103(A)(1). Moreover, to the extent that the admission of the report at the pretrial motion hearing constituted a proffer, we conclude defendants failed to show its exclusion for review by the jury was prejudicial. Given the highly technical nature of the report, we question whether the jury could have understood it sufficiently to rely on its content without Dr. Koga's testimony. Additionally, mechanism-of-injury opinions other than injection into the spinal cord were set forth by other defense experts, including Dr. Elkersh, Dr. John Markman, and Dr. Sean Graham. Insofar as Dr. Koga's statement that the MRI and CT images did not show a "needle track" but evidenced cord edema with varying possible causes, other defense experts also so testified, including Dr. Elkersh, Dr. Patricio Espinosa-Prado, and Dr. Markman. Appellants have correctly pointed out that Dr. Koga's opinion that advancement of the needle into the spinal cord was within the standard of care was not an opinion provided by any other defense expert. Specifically, Dr. Koga's report stated that it was his professional opinion that Robin "suffered a rare but known complication of cervical injections with resultant spinal cord injury." Review of the MRP opinion, which was admitted during the presentation of evidence to the jury, shows that the MRP concluded the evidence did not support the conclusion that Dr. Elkersh failed to meet the applicable standard of care. The MRP specifically found that Robin experienced "a known but rare complication of an interventional cervical injection." From this MRP conclusion, the jury could have inferred that the advancement of the needle into the spinal cord was within the standard of care. While Dr. Koga's report more directly delineated that an injection into the spinal cord fell within the standard of care than did that of the MRP opinion, ultimately Dr. Koga's opinion was in conformity with the MRP's and, therefore, cumulative. Accordingly, appellants have failed to show prejudice by the exclusion of Dr. Koga's opinions as set forth in the report.

responded that during the trial testimony of another of plaintiffs' experts, the use of a demonstrative exhibit had been withdrawn when defendants objected because it had not been timely produced. Thereafter, defense counsel complained that during the perpetuation of his testimony, Dr. Gharibo had been permitted use of an exhibit contained in medical literature. The defense suggested that this resulted in a rule that demonstrative exhibits found within the text of medical literature that were "straight anatomical depiction[s] out of a book" were permissible to use during questioning. Counsel for plaintiffs advised the trial judge that all of plaintiffs' experts had testified and been released, and that use of the demonstrative exhibit was prejudicial since medical expertise was necessary to understand the illustrations it depicted insofar as plaintiffs' theory of the case.

In issuing its ruling, which disallowed Dr. Markman's use of the demonstrative exhibit, the trial court emphasized that Dr. Gharibo's testimony had been completed July 11, 2022, and, therefore, defendants had ample time to rebut his use of an unproduced demonstrative exhibit. However, since Dr. Markman's use of the late-produced exhibit occurred after plaintiffs had rested their case-in-chief, the demonstrative exhibit was not allowed "because I just don't think it gives either side an opportunity to prepare for the information with their witnesses."

Appellants contend the trial court's rulings as to the use of demonstrative evidence by Drs. Gharibo and Markman were inconsistent. As such, they urge that the trial court's ruling excluding Dr. Markman's use of the demonstrative exhibit was a consequential error that significantly impacted the verdict.

La. C.E. art. 103(A) provides, in part, that "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." The party alleging prejudice by the evidentiary ruling of the trial court bears the burden of so proving. The trial court is granted broad discretion in

11

rulings on admissibility of evidence and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. *Doe v. ABC Sch.*, 2019-0983 (La. App. 1st Cir. 12/17/20), 316 So.3d 1086, 1101, writ denied, 2021-00098 (La. 3/9/21), 312 So.3d 582.

The record establishes that during the entire sidebar, the exhibit was projected onto the screen. Thus, the jury had ample opportunity to see its depictions. It was only after the sidebar concluded and questioning of Dr. Markman resumed that plaintiffs' attorney asked for the removal of the demonstrative exhibit. Even without the demonstrative exhibit, Dr. Markman thereafter testified in detail, fully describing to the jury a person's neck anatomy, the location of blood vessels in the neck, and his theory of the mechanism of injury.[9] Therefore, the failure to allow use of the demonstrative evidence was harmless error at worst. Given the trial court's vast discretion, under the facts and circumstances, we cannot say there was an abuse of discretion.

## Admission of Dr. Gharibo's Testimony Regarding a Pre-procedure Physical Examination:

Appellants aver that the trial court erred in denying defendants' motion in limine to exclude Dr. Gharibo's testimony as to any acts or omissions by Dr. Elkersh preceding November 7, 2012, the date of the procedure that gave rise to Robin's right-sided upper extremity deficits. They maintain that the trial court should have excluded as an impermissible expansion of the pleadings and outside

---

[9] Dr. Markman used a human skeleton to show the jury the orientation that Dr. Elkersh approached Robin in administering the injections. He explained that the skeleton he was using did not include the venous system, which drained the blood of the spinal cord and the brain. He depicted to the jury how the venous system overlays the place in Robin's neck that Dr. Elkersh was targeting in administering the injection. Dr. Markman advised the jury that most likely, the needle contacted the vascular system and the overwhelming likelihood was that area had a spontaneous spasm. Dr. Markman further elaborated how the vein overlay is different in each person and drains differently. According to Dr. Markman's theory of the mechanism that resulted in Robin's injury, when the venous walls tightened, the blood could not drain, which caused swelling. Once the blood was restored and reflowed, as a result of the lack of draining, some of the cells were compromised giving rise to the spinal cord hemorrhage, which caused the deficits in her right upper extremity.

the scope of the allegations presented to the MRP any testimony or opinion related to acts and omissions by Dr. Elkersh on November 6, 2012. By allowing the testimony and corresponding opinion, appellants contend the trial court permitted the jury to hear prejudicial evidence that tainted the verdict and requires a de novo review.

The trial court has great discretion to admit or disallow evidence subject to an objection based upon the scope of the issues and pleadings and to determine whether evidence is encompassed by the general issues raised in the pleadings. A court of appeal will not disturb a trial court's determination in this regard absent an abuse of the trial court's discretion. *Salvador Valencia, LLC v. Robertson Dev., L.L.C.*, 2022-0489 (La. App. 1st Cir. 12/22/22), 360 So.3d 555, 559.

Dr. Gharibo, accepted as an expert in the fields of anesthesiology, pain management, and best practices, testified that although Robin had been sent to Dr. Elkersh to administer cervical facet injections, by failing to conduct his own physical exam of Robin's neck verifying the need for the injections prior to commencing the November 7, 2012 procedure, Dr. Elkersh breached the standard of care. Reviewing Robin's medical history with Dr. Elkersh, Dr. Gharibo noted that the November 7, 2012 procedure was actually the third time that Dr. Elkersh had administered cervical facet injections in her neck. Looking at the note from Robin's November 6, 2012 pre-procedure office visit with Dr. Elkersh, Dr. Gharibo pointed out that, under the portion of the printed form entitled "Physical Exam," Dr. Elkersh failed to include a notation of having conducted an independent exam of Robin's neck. He explained to the jury the proactive maneuvers that needed to be performed to confirm that Robin's cervical facets were tender so as to warrant the procedure. Later in his testimony, Dr. Gharibo

13

advised the jury that the pre-procedure physical exam should have been conducted on November 6, 2012 at the pre-procedure office visit.

In ruling on defendants' motion in limine, the trial court stated:

> [A]nything prior to [November 7, 2012], I think that … is earlier acts of alleged malpractice and breach of the standard of care that's not contained in the petition. So I …. grant [the] motion in limine to strike those references. …

> And I think [November 6, 2012] relates to that [November 7, 2012 cervical facet injections procedure]. Anything before that relates to the other injections [and are excluded]. …

> [I]f there was something … done to prepare for that [November 7, 2012] procedure … directly related in time that wasn't done, I think that is contemplated within the petition. So I [will] allow that, but nothing before.

In their petition, letter requesting the formation of the MRP, and MRP position paper, the Oldenburgs alleged, among other things, that on November 7, 2012, Robin presented to Dr. Elkersh for the cervical facet injection procedure, that Dr. Elkersh lacked the skill or care required by the specialty, and that he injured Robin's spinal cord during the procedure. Our review of Dr. Gharibo's full testimony convinces us that his opinion was simply that a pre-procedure exam should have been undertaken prior to administration of the cervical facet injection procedure, ostensibly even on the day of the procedure. Although Dr. Gharibo focused on November 6, 2012 at times during his testimony, opining that the lack of a physical exam was a breach in the standard of care, that date was suggested in conjunction with Robin's medical history, which included the pre-procedure exam held on November 6, 2012. But nothing in Dr. Gharibo's testimony expressly required that the undertaking of a pre-procedure physical exam to confirm continued ongoing pain was required only on November 6, 2012 and at no subsequent time. Accordingly, we cannot say the trial court abused its discretion in concluding Dr. Gharibo's opinion that the failure to conduct a pre-procedure

14

physical exam is encompassed by the general issues raised in the allegations in the petition, MRP letter, and MRP paper.[10]

Because we have found no error in the trial court's evidentiary rulings, appellants are not entitled to a de novo review. And while they have not asserted that the determination of liability is manifestly erroneous, we expressly note a reasonable factual basis exists for the jury's findings that Dr. Elkersh breached the standard of care, causing damages to Robin. See *White v. LAMMICO*, 2021-1222 (La. App. 1st Cir. 4/8/22), 342 So.3d 63, 67 (To establish a claim for medical malpractice, the plaintiffs must prove by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury.). See also *Landry v. Doe*, 2019-0880 (La. App. 1st Cir. 6/26/20), 307 So.3d 1064, 1073, writ denied, 2020-00952 (La. 10/20/20), 303 So.3d 313, and writ denied, 2020-00948 (La. 10/20/20), 303 So.3d 316 (Resolution of whether a plaintiff proved the elements of a claim for medical malpractice is a factual determination that may not be reversed on appeal absent manifest error.).

The jury heard extensive testimony from Dr. Gharibo, Dr. Joseph Ghitis (an expert in the fields of radiology and neuroradiology), and Dr. Chad Domangue as to the mechanism of injury, identifying it as the injection of an injectate consisting of a steroid (Decadron) and an anesthetic (Marcaine) into Robin's spinal cord.

---

[10] Dr. Elkersh complains that the theory of liability that he breached the standard of care by failing to conduct a pre-procedure exam was not revealed until six days before the discovery cutoff deadline and one month before the start of trial. He buttresses this complaint with the exclusion of Dr. Koga's trial testimony and report, suggesting Dr. Koga's opinion would have rebutted Dr. Gharibo's on this point. As we have already noted, the parties agreed to a tight schedule for expert opinions, identifying three experts in the two months before trial, including Dr. Gharibo. Thus, Dr. Elkersh cannot assert prejudicial error on this basis, especially since the opinion is encompassed within the general issues raised by the allegations of the pleadings. In addition, the record shows that plaintiffs' expert, Dr. Chad Domangue, with expertise in neurology, pain management, and complex regional pain syndrome, opined that the lack of a physical exam was not a breach of the standard of care in this case, rebutting Dr. Gharibo's opinion. Thus, Dr. Koga's testimony would have simply been cumulative. Therefore, we cannot say the trial court abused its discretion on this basis.

15

Each of these plaintiffs' medical experts pointed out to the jury the needle track on a November 10, 2012 MRI image that supported their respective opinions that Robin's spinal cord had been punctured and injected. Drs. Gharibo and Domangue each testified that Dr. Elkersh breached the standard of care when he injected the injectate into Robin's spinal cord. Additionally, Drs. Gharibo and Domangue each opined that Dr. Elkersh failed to properly use fluoroscopy (which are rapidly-produced x-rays taken during the procedure) and that this failure was another breach in the standard of care. In light of this outlined medical testimony, a reasonable factual basis exists to support the jury's findings imposing liability.

## GENERAL DAMAGES

Intervenors maintain that the award of general damages, particularly the award of $400,000.00 recoverable against the PCF, was grossly excessive, and that the trial court abused its discretion in so rendering. They request reduction of the total general damages award to an award consistent with the amounts rendered in similar cases.[11]

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms. *Jones v. Mkt. Basket Stores, Inc.*, 2022-00841 (La. 3/17/23), 359 So.3d 452, 464. In the assessment of damages in cases of offenses, much discretion must be left to the judge or jury. La. C.C. art. 2324.1.

In *Pete v. Boland Marine & Mfg. Co., LLC*, 2023-00170 (La. 10/20/23), 379 So.3d 636, 641, the Louisiana Supreme Court has recently explained that the

---

[11] On appeal, intervenors do not levy any assertions challenging the quantum of the jury's awards as set forth in the verdict, limiting their contentions to a challenge of the quantum of the award of $500,000.00 in total general damages awarded by the trial court. See n.3, supra. Therefore, the issue of whether the jury's awards in the amounts set forth in the verdict were excessive and, therefore, an abuse of discretion is not before us, and we pretermit a discussion of that issue.

16

discretion afforded the trier of fact "is not unfettered." Thus, the two-step analysis by which appellate courts review general damage awards has been modified. The question of whether the trier of fact abused its discretion in assessing the amount of the award of general damages remains the initial inquiry. But to evaluate this issue, appellate courts have been instructed to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. See *Pete*, 379 So.3d at 644. If an abuse of discretion is found, the second step is for appellate courts to then consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Id.*

The record shows the following relevant evidence as to the general damages Robin suffered. Robin was 50 years old on November 7, 2012, when Dr. Elkersh performed the cervical facet injection procedure in her neck for the fourth time. Robin described Gair and herself as "a pretty active couple" at that time who enjoyed, among other things, boating, canoeing, hiking, bowling, and playing pool. Robin was in two bands, one with Gair, and they also joined in with others who performed in bands. Robin told the jury that she and Gair participated in karate together and that she was a second-degree blackbelt who had participated in national competition and ranked third in an international competition.

In 2005, she and Gair moved to St. Tammany Parish, and she began working as a deputy clerk at which she primarily sat and typed. In 2012, Robin began experiencing neck pain. She was referred to Dr. Elkersh, who administered multiple cervical facet injection procedures beginning in March 2012. The procedures had been uneventful and quick. According to Robin, she did not have any relief after the first one, could not recall if she had relief after the second one, but had relief after the third one.

17

After the November 7, 2012 procedure, Robin recalled waking up to a different experience from her earlier post-procedure care. She was on oxygen, a wet rag was on her head, people were circling her, and "it was a lot of pandemonium." She was screaming, asking why she was experiencing "unbearable" pain on her left side and unable to pick up her right arm.

Robin left the API facility in Hammond after several hours in post-procedure care with the understanding that her condition was temporary and would improve once the lidocaine wore off. She detailed the "bumpy," painful ride back to her St. Tammany Parish residence and found herself "more hysterical" after she returned home. Robin was unable to sleep from the "unbelievable pain" on her left side and continued to have right-side weakness. She also had a pain that was "very different" down her neck and shoulder blade.

The next morning, Robin called Dr. Elkersh insisting on an MRI. Dr. Elkersh sent an order for an MRI and agreed to see Robin that afternoon at his Covington office. Despite waiting to see Dr. Elkersh, he did not examine her. He took the MRI image disk and advised Robin that he would call her later. When she arrived home, Dr. Elkersh called and instructed her to go to the North Oaks hospital in Hammond. According to Robin, Dr. Elkersh did not explain himself, causing her to become "crazy, hysterical."

At the hospital, Robin continued experiencing the same pain and inability to lift her right arm. Although she was able to move her finger, her hand "felt kind of like it does now, [pins] and needles constant." An IV of steroids was administered and the next day, she began feeling "steroid nervousness" and a steroid-induced panic. Robin was afraid she was going to experience permanent paralysis. After three days on steroids, Robin was able to feed herself although it was challenging.

On the fourth day, Robin was able to lift her arm. She participated in occupational and physical therapy, the latter of which helped her stabilize when she walked.

As she testified, the jury was able to see Robin engage in a habit that started while she was in the hospital. She rubs over her thumb with a rag to help with sensitivity issues. She explained that for the last ten years, it has felt like her hand is continually in a bowl of ice water and that the worst discomfort is in her thumb and index finger. Rubbing the thumb helps alleviate the pain temporarily. Robin told the jury that she prefers to use restaurant napkins because the material is of a stiffness that provides the most relief. She has rubbed her thumb so frequently that the skin tears open. Because she feels like there is no skin on her hand, Robin wears a particular furry sock at night, underscoring her sensitivity to textures. She is unable to sleep with her hand open.

Robin described a "shock" sensation that she experiences when she looks down as an "electric" feeling in her neck and head. She has been advised a surgical solution does not exist to address her hand discomfort, right upper extremity weakness, or the "shock" sensation she experiences. A neurologist has advised Robin there are no cures.

Robin began seeing Dr. Domangue for pain management in January 2013. He has prescribed medications for neuropathy, which caused her to gain 30 pounds and do not provide 100% relief. Robin uses ice and a TENS unit to aid in pain relief. She undertook a trial for a spinal cord simulator but determined that the relief was not worth the risk of allowing another surgical cervical intervention.

Robin advised the jury of two falls she experienced: one in 2014 and another in 2018. In both instances, emphasizing her second-degree blackbelt conditioning, Robin was convinced that she would not have suffered the injuries she sustained

19

had the falls occurred before the November 7, 2012 procedure because she had sufficient agility and reflexes to catch herself and avoid falling to the ground.

On the date of trial, Robin continued to feel stress and neck, back, and arm pain as well as neuropathy in her hand. She is unable to touch household cleaners, gasoline, or the alcohol in hand sanitizers because they cause pain and irritation of her right hand. Although she is right-handed, she has learned to apply makeup with her left hand, but it takes longer. Gair initially had to brush her hair, but while it takes longer and she is in pain, she has learned to do so for herself.

Robin told the jury that the intimacy between Gair and her is not the same. They no longer share a bed because she kept him awake with her restlessness from the discomfort. She cannot ride in a vehicle for long distances so she must fly when they take vacations. Robin testified that she no longer skis, dives, rides motorcycles, bowls, or bikes. She mostly stays at home. Robin feels as though with each new problem, she has lost friends. She cannot stay out long because she becomes tired and needs to apply ice to her neck and back. She and Gair gave up their Pelicans season tickets because Robin was unable to climb the stairs without difficulty. Given the changes in her physical appearance and lifestyle, Robin stated that her self-confidence has diminished and she feels worthless. She is self-conscious, anxious, and shakes.

Gair testified in conformity with Robin. He had accompanied her to the API facility for the cervical facet injection procedure and more fully detailed her discomfort after discharge, on the ride home, and once at home, indicating she was unable to sleep and remained in constant discomfort. Gair accompanied Robin to the North Oaks hospital and remained with her almost the entire time she was there. He told the jury that two physicians expressed surprise that Robin was

walking. Gair also stated that based on some of the theories of mechanism of injury he was told, he had genuine concerns whether Robin was going to die.

Gair provided the jury with a more articulated description of Robin's occupational and physical therapy sessions, including how she had to learn to write and walk on grass again. Due to her post-procedure clumsiness, Robin easily loses track of whether she has taken the required medication; therefore, Gair has maintained Robin's prescription regime. He explained how Robin uses three separate ice packs on parts of her neck and back multiple times a day. Gair advised the jury that Robin was unable to return to work fulltime. She then tried to work parttime but was unsuccessful.

Insofar as traveling with Robin, Gair elaborated that she is unable to sit in a vehicle for long periods of time and that they cannot stay in a hotel that does not have a freezer because of her need for the ice packs to function. He also indicated issues with flying including that they have to travel with a briefcase full of medications and her TENS unit. Gair noted the many activities in which they no longer participate, advising the jury that she is his best friend and that he was not going to engage in events like bowling, fishing, boating, or biking without her. In conformity with his wife, Gair agreed that Robin's personality has changed since she was injured in the cervical facet injection procedure. She has lost her confidence, is exhausted from the pain, and is self-conscious about the weight gain.

Dr. Domangue testified as to the nature of Robin's injury and the scope of her impediments. He stated that Robin no longer has fine motor skills in her hand. The sensory tracts, ability to regulate temperatures, and the blood vessels in her hand have all been damaged. Additionally, her hand swells, and her skin is dry. Dr. Domangue advised the jury that Robin will never have 100% relief.

Comparing imaging from 2013 with later images, Dr. Domangue stated that they continue to show similar findings in the spinal cord, which meant that while the injectate was absorbed over time, Robin nevertheless has permanent scarring. He pointed out on imaging the area of abnormality and its extension, advising the jury that this was why her arm does not work like it did before November 7, 2012. According to Dr. Domangue, Robin's left side sensitivity is in part due to complex pain syndrome. The mass effect of injectate into the spinal cord pushed its structure to the side, affecting other areas of Robin's body. Dr. Domangue also attributed the falls that Robin experienced to the injury to her spinal cord as well. He explained the area affected is the region that regulates proprioception, which is the ability to know where one is in space. Robin continues to have problems from the kyphoplasty surgery she had to have as a result of the 2014 fall in which she broke three vertebrae in her back. Dr. Domangue testified that Robin will likely fall again in future.

Because Robin has been on medications for ten years, including narcotics, Dr. Domangue sees the pain on her face and that she has aged. Additionally, she has developed osteopenia, which Dr. Domangue stated was due to chronic opioid use. He noted that the medication is shortening Robin's lifespan and weakening her immune system and that "the cure" is part of the complex pain syndrome from which Robin suffers.

A spinal cord stimulator was an unavailable relief because Robin has PTSD about her neck. Dr. Domangue recalled that when they considered use of a stimulator, Robin was anxious and declined to have another procedure in her neck area.

Insofar as future prognosis, Dr. Domangue advised the jury that there is no fix for Robin. As she ages, she is at higher risk for additional problems. Although

she initially responded well to the medications that have been administered to her, over time they have become less effective. Dr. Domangue pointed out to the jury how Robin constantly moved her hands, which he described as both voluntary and involuntary reflexes. The napkin rubbing is voluntary as Robin tries to focus her attention away from the pain; but she also has involuntary tremors that resemble those of Parkinson's disease.

Dr. Domangue reminded the jury that before the November 7, 2012 procedure, Robin was a "well put together" woman who functioned highly neurologically. After the injection into her spinal cord, she had a rapid deterioration. She has pains, falls, and suffers from psychological issues. She is unable to sleep and is judged because of her constant hand movement. Robin has experienced a major drop in neurological function and in her quality of life. Dr. Domangue expressly discounted any suggestion that Robin's pain before and after the injury were similar. The pre-procedure neck pain was arthritis but the post-procedure injury is a devastating neurological insult. He described the two pains as entirely different.

In ascertaining whether the trial court abused its discretion in awarding $500,000.00 in total general damages, we turn to a consideration of prior awards in similar cases. We note that in presenting their appellate assertions, counsel have adjusted the awards for inflation in all the cases they have cited.

Of the cases cited by intervenors, none include injuries or circumstances identical to those presented to us in this appeal. See *Wise v. Nanda*, 50,944 (La. App. 2d Cir. 12/28/16), 211 So.3d 629, writ denied, 2017-0213 (La. 3/24/17), 217 So.3d 354 (the jury's award of $250,000.00, inflation-adjusted to $317,947.70 was not appealed by patient, injured by physician who tore her dura, i.e., the membrane covering the spinal cord, during a decompressive cervical laminectomy, which was

23

subsequently repaired but left patient with weakness in all four extremities and blood clots); *Cortez v. Zurich Ins. Co.*, 98-2059 (La. App. 1st Cir. 12/28/99), 752 So.2d 957 (award of $140,000.00, inflation-adjusted to $255,419.73, affirmed where utility pole fell on parked car and driver in the car was struck on top of her head, rupturing cervical discs at two levels, causing headaches, neck pain, and carpel tunnel, as well as PTSD and depression); *Birdsall v. Regional Elec. & Constr., Inc.*, 97-0712 (La. App. 1st Cir. 4/8/98), 710 So.2d 1164 (plaintiff, who struck his head on a board protruding out of defendant's work truck, suffered headaches, neck and arm pain, and intermittent numbness in hands, awarded $150,000.00, or $283,431.69 when adjusted for inflation); and *Johnson v. State through Dep't of Pub. Safety and Corrs.*, 95-0003 (La. App. 1st Cir. 10/6/95), 671 So.2d 454, writ denied, 95-2666 (La. 1/5/96), 667 So.2d 522 (passenger in moving vehicle accident suffered herniated discs at two levels of her neck sustaining neck stiffness, sporadic pain, and aggravation of lower lumber arthritis awarded $85,000.00 or adjusted amount of $169,806.99).

For example, the range of symptoms that Robin has suffered includes issues with the regulation of proprioception, which has given rise to falls and caused additional injuries. See e.g., *Hall v. Brookshire Bros., Ltd.*, 2001-1506 (La. App. 3d Cir. 8/21/02), 831 So.2d 1010, affirmed, 2002-2404 (La. 6/27/03), 848 So.2d 559 (award of $500,000.00, statutorily reduced from jury's award of $1,500,000.00, or $2,637,511.85 inflation-adjusted, was affirmed in patient who suffered permanent injury to vestibular system, which compromised her mobility and stability leaving her with a propensity to fall but also compromised her vision, general balance, and equilibrium as she ages) (cited by the Oldenburgs). But Robin's proprioception injury and its effects, including two falls, one which

required surgical intervention, were not accounted for in any of the cases that the intervenors suggest establish a proper amount of an award.

Additionally, none of the cases offered by intervenors considered the impact her injuries have had on the highly active lifestyle that Robin engaged in prior to the cervical facet injection procedure. See e.g., *McLemore v. Fox*, 565 So.2d 1031 (La. App. 3d Cir.), writs denied, 569 So.2d 966 & 968 (La. 1990) (appellate court determined award of $150,000.00, or inflation-adjusted to $349,459.97, was an abuse of discretion and increased to $300,000.00, or $698,919.94 after adjustment for inflation, where a motor vehicle accident plaintiff with asymptomatic preexisting condition affecting the cervical spinal canal became symptomatic post-accident, experiencing an injury "as severe as it could possibly be to the cervical area without causing complete paralysis," including constant pain from spasticity, which rendered him unable to work, mentally depressed, and socially and physically inactive).

Based on the totality of the circumstances, particularly Robin's physical, mental, and life-altering injuries, including the complex pain syndrome, osteopenia, the proprioception injury, and the lost active lifestyle in which Robin engaged, we cannot say that the reduced award of $500,000.00 in total general damages was an abuse of discretion.[12] Accordingly, we affirm the trial court's award of excess damages against the PCF in the amount of $400,000.00.

---

[12] The jury awarded Gair $200,000.00 for his loss of consortium damages and that award was necessarily included in the statutory limit of the Louisiana Malpractice Act. See *Williams v. Enriquez*, 40,305 (La. App. 2d Cir. 11/17/05), 915 So.2d 434, 437 ("The statutory $500,000 cap includes loss of consortium damages as they are derivative claims that arise from the same act of malpractice."). The compensable elements of a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. *Lemoine v. Mike Munna, L.L.C.*, 2013-2187 (La. App. 1st Cir. 6/6/14), 148 So. 3d 205, 214. In challenging the award of $400,000.00 imposed against the PCF, intervenors have not accounted for Gair's loss of consortium claim in any manner.

25

## DECREE

For these reasons, the trial court's judgment is affirmed. Appeal costs in the amount of $11,745.50 is assessed one-half to defendant-appellant, Dr. Mohamed Elkersh, and one-half to intervenors-appellants, the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Fund Oversight Board.

**AFFIRMED.**